UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80948-CIV-DIMITROULEAS

MICHAEL MILLER, individually and on
behalf of all others similarly situated,                                      Magistrate Judge Rosenbaum

            Plaintiffs,

vs.

DYADIC INTERNATIONAL, INC., MARK A.
EMALFARB, STEVEN J. WARNER, HARRY Z.
ROSENGART, RICHARD J. BERMAN, ROBERT
B. SHAPIRO, and GLENN E. NEDWIN,

            Defendants.
_____/

**ORDER APPOINTING LEAD PLAINTIFF AND APPROVING LEAD COUNSEL**

        THIS CAUSE is before the Court upon Capital Max Inc's Motion to be Appointed Lead

Plaintiff, and for Approval of its Selection of Lead Counsel and Liaison Counsel [DE 9], and

Olav C. Holst's Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel [DE

16].  The Court has carefully considered the Motions, Capital Max's Supplemental Memorandum

of Law in Support of its Motion for Appointment as Lead Plaintiff and Approval of Lead

Counsel [DE 65], the Reply Brief of Class Member Olav C. Holst in Further Support of His

Motion for Appointment as Lead Plaintiff [DE 69], the Rebuttal Brief of Class Member Olav C.

Holst in Opposition to Capital Max's Motion for Appointment as Lead Plaintiff [DE 66], Capital

Max's Response to Holst's Rebuttal Brief in Opposition to Capital Max's Motion for

Appointment as Lead Plaintiff [DE 67] the attached exhibits, declarations and affidavits, the

arguments of the parties made before the undersigned at the hearing on March 14, 2008, and is

otherwise fully advised in the premises.

## I. <u>BACKGROUND</u>

This case involves allegations against Dyadic International, Inc. ("Dyadic") and several of its current and former officers and directors for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Dyadic is a biotech company based in south Florida and its securities were traded publicly on the American Stock Exchange ("AMEX").  The plaintiffs in the various actions against the Defendants are all purchasers of Dyadic stock and claim that Defendants made material misstatements and omissions regarding financial improprieties in the operation of some of the company's Asian subsidiaries in violation of the federal securities laws. When these improprieties became public the securities dropped in value.  Dyadic then fired Defendant Emalfarb stating that he had "willfully concealed facts" relating to the Asian subsidiaries' improprieties and on April 23, 2007, AMEX halted trading of Dyadic securities at the company's request.  Trading of Dyadic stock remains halted and AMEX has recently given notice of its intent to delist Dyadic securities entirely.  Plaintiffs allege they were injured as a result of the Defendants securities violations.

Six (6) different plaintiffs brought suit against Dyadic for these violations, which have been consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure into this single action in front of the undersigned [DEs 18 & 20].  The plaintiff in <u>Miller</u>, the first filed case, published notice to the class on October 12, 2007 giving any other group of interested persons up to and including December 11, 2007 within which to petition the Court to be appointed Lead Plaintiff.  The plaintiff in <u>Miller</u> defined the Class period as November 10, 2006 through April 23, 2007.  This was the shortest class period claimed in any of the six (6) complaints.  The

2

longest class period was defined by Capital Max as November 14, 2005 through April 23, 2007.

Initially, five plaintiffs, or plaintiff groups petitioned for appointment as lead plaintiff in this action.  On December 14, 2008, based on the information available at the time, the Court appointed the Arab Banking Corporation ("ABC") Lead Plaintiff in this case [DE 19].[1]  In the wake of that Order, proposed lead plaintiffs Capital Max, Inc.("Capital Max") and Olav C. Holst ("Mr. Holst")  sought brief discovery into ABC's adequacy.  Mr. Holst also filed a Motion for Reconsideration [DE 25].  Subsequently, however, Capital Max and ABC filed a Joint Motion for Appointment as Co-Lead Plaintiffs [DE 36].  Since that time, ABC has withdrawn as Lead Plaintiff, and the Court must now appoint a new Lead Plaintiff in this action.  The two remaining candidates are Capital Max and Mr. Holst.

Proposed lead plaintiff Capital Max is an investment advisor registered with the Securities and Exchange Commission, organized under the laws of Florida and headquartered in Florida.  Capital Max provides investment advisory services to high net worth individuals, certain institutional investors, and other pooled investment vehicles.  Frank Prissert ("Prissert") is the CEO of Capital Max and the individual primarily responsible for its investment advice and research.  In its initial motion to be appointed lead plaintiff, Capital Max claimed losses totaling $359,857.00.  However, after correcting what Capital Max claims were minor "clerical errors," Capital Max now claims a "financial interest" of $381,564.87 under the last-in-first-out ("LIFO") method of calculating loss and $409,567.68 under the first-in-first-out ("FIFO") method of calculating loss.

---

[1] ABC claimed losses of $2.7 million, making its claimed loss by far the largest of the potential lead plaintiffs at the time.

Proposed lead plaintiff Mr. Holst is an individual, retired military officer, currently residing in Hawaii.  Mr. Host bought shares of Dyadic stock on behalf of himself, his brother, and the estate of their deceased mother through Shaw Farms PTY Ltd ("Shaw Farms"),[2] an Australian Corporation.  Shaw Farms is a family trust created by Mr. Holst and his family to invest in the stock market on their behalf.  Mr. Holst is the Director of Shaw Farms.  In his initial application, Mr. Holst claimed that he had purchased 60,000 shares of Dyadic stock for a loss of $328,500.00.[3]  Now, Mr. Holst claims that the prior report contained a "typographical error" and he actually purchased 80,000 shares for a total loss of $391,500.00.  Mr. Holst still holds all of the shares he purchased on behalf of Shaw Farms.

The parties have engaged in some uncooperative discovery, the issue has been more than adequately briefed, the undersigned has heard oral arguments and the issue of Lead Plaintiff in this putative class action is now ripe for disposition.

## II. DISCUSSION

The Court must now decide between two proposed lead plaintiffs, both of whom concede that the difference between the losses suffered by each is small.  Accordingly, the Court will go through the analysis as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), select the appropriate class period, select the presumptive lead plaintiff, ensure that

---

[2] Proposed lead plaintiff Capital Max argues that Shaw Farms is actually the real party in interest in this case rather than Mr. Holst.  However, because the Court finds that neither Mr. Holst, nor Shaw Farms would be the "most adequate lead plaintiff," the Court need not address this distinction and will simply refer to Mr. Holst.

[3] While Mr. Holst only claimed $234,000.00 in losses in his initial application, he based this calculation on a shortened class period.  Mr. Holst, however, also listed an additional 30,000 shares purchased pre-class period which would add another $94,500.00 to his losses.  As discussed in more detail below, because the Court elects to use a longer class period than that relied on by Mr. Holst in his initial application, the Court will give Mr. Holst credit for these pre-class period losses, bringing his total claimed losses to $328,500.00.

the presumptive lead plaintiff is otherwise adequate, and finally approve lead and liaison counsel for the class.

### 1. Standard for Selection of Lead Plaintiff under the PSLRA

These motions are governed by the Securities Exchange Act of 1934, as amended by the PSLRA.  The PSLRA was enacted to remedy perceived abuses in the class action procedure in securities fraud actions.  See Piven v. Sykes Enters. Inc., 137 F. Supp. 2d 1295, 1301 (M.D. Fla. 2000).  The PSLRA provides that within ninety (90) days after publication of notice, the court must consider any motion made by a class member and appoint as Lead Plaintiff the member or members of the class that the court determines to be most capable of adequately representing the interests of the class members.  15 U.S.C. § 78u-4(a)(3)(B)(i).

In determining the "most adequate plaintiff," the PSLRA creates a presumption.  It provides that:

> the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that -
> (aa) has either filed the complaint or made a motion in response to a notice . . .
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).[4]  In determining which proposed lead plaintiff has the "largest financial interest" relevant factors are (1) the number of shares purchased during the class period, (2) the amount of the investment, and (3) the alleged loss.  See Burke v. Ruttenberg, 102 F. Supp. 2d 1280, 1341 (N.D. Ala. 2000).  This is only a presumption, however.  Any member of the

---

[4] The first requirement does not merit further discussion as both proposed lead plaintiffs have filed a complaint and a motion for appointment as lead plaintiff.

proposed class may rebut the presumption upon proof that the presumptively most adequate

plaintiff "is subject to unique defenses," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb), or "will not

fairly and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).

*2. The Longest Class Period is the Appropriate Class Period*

As a preliminary matter, the Court must determine the appropriate class period to utilize

in selecting a lead plaintiff.  The Court emphasizes that this determination is for the purposes of

the selection of the lead plaintiff only, subject to modification at a later date, upon motion by the

parties and with the participation of the Defendants.  Capital Max argues that there are two

relevant class periods that the Court could use in its "financial interest" calculation: (1) the

longest class period in the complaint filed by Capital Max (November 14, 2005 through April 23,

2007) or (2) the shorter class period in the first-filed Miller action (November 10, 2006 through

April 23, 2007).  Under the longer class period, both proposed parties claim losses.  However,

under the shorter period only Capital Max claims to have suffered damages.  Mr. Holst did not

make any purchases during the shorter proposed class period.  Accordingly, under the shorter

class period, not only could Mr. Holst not serve as lead plaintiff, he would not even be a member

of the class.

Some courts have found that the class period noticed in the first-filed complaint is the

appropriate class period at the lead plaintiff selection phase because it was the period sent out in

the notice to the class.  See Piven, 137 F. Supp. 2d at 1303; cf In Re Telxon Corp. Sec. Litig., 67

F. Supp. 2d 803, 818 (N.D. Ohio 1999).  However, the Court finds that the better rule, as many

other courts have held, is the rule that chooses the most inclusive class period at this early stage

in the litigation.  See e.g. In re Doral Fin. Corp. Sec. Litig., 414 F. Supp. 2d 398, 402-03

(S.D.N.Y. 2006); Bhojwani v. Pistiolis, 2007 U.S. Dist. LEXIS 52139 * 14 (S.D.N.Y. June 26,

2007); cf Grand Lodge of Pa. v. Peters, 2007 U.S. Dist. LEXIS 48191 *6-7 (M.D. Fla. June 22,

2007) ( "[Proposed Lead Plaintiff] asks this Court to delve into the merits of the claims and to

define the class period at this early stage of the proceedings before a class has been certified or

those issues have been fully briefed.  This it cannot do.").  The Court agrees with the reasoning

of the court in In re Doral, that the longest, most inclusive class period is appropriate at this stage

in the litigation because "it encompasses more potential class members."  414 F. Supp. 2d at 402.

Narrowing the class period is more appropriate at a later stage of litigation, with participation

from the Defendant.

      In this case, the Court finds the selection of the longer, more inclusive class period is

especially appropriate for two additional reasons.  First, the Miller class period, which was the

first-filed action and the class period included in the notice in this case, is by far the shortest class

period selected by any of the plaintiffs who filed complaints in this case.  Each of the additional

five (5) complaints in this consolidated action choose a longer class period than the Miller

plaintiffs, making selection of the shortest class period particularly inappropriate.  Second, the

longest class period in this case was selected by proposed lead plaintiff Capital Max.  Now, while

Mr. Holst argues for the use of the longest, most inclusive period, Captial Max has changed its

position slightly to suggest that the shorter period might be appropriate.  Accordingly, the Court

finds that the longest and most inclusive class period, beginning on November 14, 2005 and

ending on April 23, 2007, is the appropriate class period for purposes of appointing a lead

plaintiff.  The Court will go on to determine which of the proposed lead plaintiffs has the largest

financial interest and is therefore the "presumptive lead plaintiff" in this action.

*3. The Parties Must be Held to the Losses Alleged in their Initial Lead Plaintiff Applications*

In his initial Motion to be Appointed Lead Plaintiff, Holst only claimed $234,000.00 in damages under the proposed class period. He did, however, claim 30,000 shares and $94,500.00 in pre-class period losses, which will now fall within the class period selected by the Court, bringing his total to $328,500.00. Well after the filing of his application for appointment as lead plaintiff, Holst claimed that due to a "typographical error" that the number of pre-class period shares should have been 50,000 rather than 30,000. With the additional 20,000 shares, Mr. Holst now claims $391,500.00 in losses. Capital Max argues that the language and purpose of the PSLRA require that Mr. Holst be held to the losses alleged in his initial lead plaintiff application, and he should not be able to rely on the additional 20,000 stocks claimed after the sixty (60) day period had expired. The Court agrees.

Section 78u-4(a)(3)(i)(II) of the PSLRA provides that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." As Capital Max points out, many courts have held this provision to hold lead plaintiff applicants to the claims and calculations in their initial lead plaintiff applications, regardless of subsequent revisions. See e.g. In re Telxon, 67 F. Supp. 2d at 818 ("The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed."); In re Able Labs. Sec. Litig, 425 F. Supp. 2d 562, 565-66 (D. N.J. 2006) (same); Ferrari v. Gisch, 225 F.R.D. 599, 603-04 (C.D. Cal. 2004) (same); In re Enron Corp. Sec. Litig., 206 F.R.D. 427, 440 (S.D. Tex. 2002) (finding that allowing "supplementation" of financial loss after the expiration of the sixty (60) day period would thwart the PSLRA's intent of

expediting the Lead Plaintiff appointment process); <u>Singer v. Nicor, Inc.</u>, 2002 U.S. Dist. LEXIS 19884 *9 (N.D. Ill. Oct. 17, 2002) ("the court will not consider the candidates' amendments of their amount of financial loss made after the filing deadline.").  In essence, these courts have held that the sixty (60) day filing deadline is a hard-and-fast rule with no room for subsequent supplementation or modification.

        As one court pointed out, a different rule would "encourage parties seeking lead plaintiff status to 'manipulate the size of their financial loss by enlarging the class period or adding additional persons to a group' in supplemental filings . . . [which] would invite additional briefing. . . effectively rendering the strict timeliness set forth in the [Reform Act] meaningless." <u>Ferrari</u>, 225 F.R.D. at 603-04 (quoting <u>In re Telxon</u>, 67 F. Supp. 2d at 819).  However, the court in <u>In re Telxon</u>, found that a proposed lead plaintiff's motivation and the fact that the initial representation was incorrect were immaterial.  67 F. Supp. 2d at 819 ("The motives of the [proposed lead plaintiff], however, are irrelevant to the fact that supplementation is not contemplated by the PSLRA, and do not alter the fact that supplementation after the expiration of the sixty (60) day period would not only be inconsistent with the language and purposes of the PSLRA, but would effectively nullify the time limits expressly provided therein.").  The Court agrees with the reasoning of these courts in finding that to allow supplementation after the expiration of the sixty (60) day period would be inconsistent with both the language and purposes of the PSLRA.  Accordingly, while there is no evidence that Mr. Holst's omission of the additional 30,000 shares was due to anything but a typographical error, the Court will nevertheless hold the parties to the losses initially claimed in their lead plaintiff applications.

        It follows then, utilizing the longest proposed class period and the losses as claimed

during the statutory sixty (60) day period for seeking appointment as a lead plaintiff, that Capital

Max has the largest financial interest in this case.  In its initial lead plaintiff application, Capital

Max claimed losses of $359,857.00[5] on 145,300 shares of Dyadic stock, with a total investment

of $738,493.00.  In his initial lead plaintiff application Mr. Holst only claimed losses of

$328,500.00,[6] on 60,000 shares of Dyadic stock, with a total investment of $328,500.00.

Because the Court must disregard the supplemental losses claimed later by Mr. Holst, the Court

finds that Capital Max has the largest financial interest by any calculation.[7]

### 4. Capital Max Satisfies the Requirements of Rule 23(a)

Under § 78u-4(a)(3)(B) of the PSLRA, in addition to possessing the largest financial

interest in the outcome of the litigation, the most adequate lead plaintiff must "otherwise satisf[y]

the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-

4(a)(3)(B).  Rule 23(a) imposes four (4) requirements: (1) numerosity, (2) commonality, (3)

typicality, and (4) adequacy of representation.  Fed. R. Civ. P. 23(a).  Of those prerequisites, only

---

[5] After fixing the minor "clerical errors" in the loss calculation of its initial lead plaintiff application, Capital Max claims a "financial interest" of $381,564.87 under LIFO and $409,567.68 under FIFO.  These reporting errors differ slightly from Mr. Holst's however, because they do not reflect the dramatic discovery of 20,000 shares, they simply reflect (1) an incomplete date, (2) slightly inaccurate dates or prices, (3) duplicate trades, or (4) prices that included a broker commission.  The Court need not decide, however, whether the PSLRA would permit Capital Max to correct these errors, because even without allowing the corrections, Capital Max has demonstrated the largest financial interest in this matter.

[6] While the Court declines to include the additional 20,000 shares that Mr. Holst claimed after the close of the sixty (60) day period, it will include the 30,000 shares listed in his initial motion, but not included in his loss calculation.  Because the Court has elected to utilize the longer class period claimed in Capital Max's Complaint, these losses now fall within the class period.  Despite the fact that Mr. Holst did not claim these losses in his initial Motion, because they were included and claimed within the sixty (60) day period, the Court will count them.  The Court will not punish Mr. Holst for failing to predict which class period the Court would ultimately select.  Accordingly, Mr. Holst's losses claimed within the initial sixty (60) day period total $328,500.00.

[7] The Court notes that the parties have extensively briefed whether the FIFO or LIFO method of calculating loss is most appropriate.  However, the Court has no occasion to address this issue because Capital Max has the largest financial interest regardless of which method is utilized.

10

two - typicality and adequacy - are relevant in deciding a motion for appointment of lead plaintiff.  See Grand Lodge of Pa., 2007 U.S. Dist. LEXIS 48191 at *5 n.7; Singer, 2002 U.S. Dist. LEXIS 19884 at *10.  As the Court found in its original Order Appointing Lead Plaintiff [DE 19] each of the proposed lead plaintiffs satisfy these basic criteria.

As stated in its brief, Capital Max satisfies the typicality requirement because its claims share the same "essential characteristics as the class at large." Prado-Steinman ex rel. Prado v. Bush, 221 F.3d 1266, 1278-79 n.14 (11th Cir. 2000).  Here, Capital Max seeks to represent a class who, like itself, (a) purchased Dyadic securities, (b) at market prices artificially inflated as a result of Defendants' violations of the securities laws, and (c) suffered damages thereby. Accordingly, the Court finds that Capital Max's claims are "typical" of those of the class.

The Court further finds that Capital Max will be an adequate lead plaintiff.  The adequacy requirement is satisfied where, as here: "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the class has sufficient interest in the outcome of the case to ensure vigorous advocacy." Weinberg v. Atlas Air Worldwide Holdings, Inc., 216 F.R.D. 248, 253 (S.D.N.Y. 2003) (citing Weltz v. Lee, 199 F.R.D. 129, 133 (S.D.N.Y. 2001)).  Furthermore, Capital Max has proven that it is willing to participate in discovery and has hired competent and adequate class counsel. Accordingly, the Court finds that in addition to having the largest financial interest in this case, Capital Max otherwise satisfies the requirements of Rule 23 and is therefore the presumptive lead plaintiff in this action.

### 5. Mr. Holst Cannot Otherwise Rebut the Presumption

Although Capital Max is the presumptive lead plaintiff in this class action, Mr. Holst has

the opportunity to rebut this presumption by proving that Capital Max "is subject to unique defenses," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb), or "will not fairly and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).  In determining whether Mr. Holst has met his burden of rebutting this presumption, the Court keeps in mind that "the question *is not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair [] and adequate []' job." In re Able Labs., 425 F. Supp. 2d at 568 (quoting In re Cendant Corp. Litig., 264 F.3d 201, 268 (3d Cir. 2001)).

Mr. Holst attempts to rebut this presumption on several grounds.  First, Holst argues that Prissert's close ties with Dyadic's CEO Emalfarb, render Capital Max subject to a unique defense.  Second, he argues that Capital Max has put its own personal interests above those of the class, and finally, Holst argues that Capital Max's status as an investment advisor precludes its selection as lead plaintiff in this action.  The Court will address each argument in turn.

### a. Prissert's Limited Contact with Dyadic's CEO do not Render Capital Max Subject to a Unique Defense Rendering it an Inadequate Lead Plaintiff

Mr. Holst alleges that Capital Max is subject to "unique defenses" that will render it an inadequate lead plaintiff.  Mr. Holst's statements about Prissert's relationship with Emalfarb are no more than thinly veiled accusations of insider trading.  Mr. Holst states in his Rebuttal Brief:

> In fact, [Prissert's] relationship with [Emalfarb] may explain why he knew to sell Capital Max's stock before incurring the massive losses sustained by typical Dyadic investors.  Not only were Prissert and Defendant Emalfarb on a first name basis, the regularly exchanged emails, voice mail messages, had in-person meetings, and talked on the phone.  Even more egregious and atypical is the fact that Prissert publicly touted Dyadic stock *calling it a 'must-own' stock and offering to organize in-person meetings with Emalfarb for his clients.*"
> (emphasis in original.)

12

As the basis for this statement, Mr. Holst attaches a string of emails consisting merely of business talk and benign small talk.  However, the declaration of Mr. Prissert asserts that the two have never had a "social" or "personal" relationship, and in fact have never even met in person. Prissert further asserts that even the few times they have spoken over the phone they have only discussed business matters, and Emalfarb has never communicated any non-public information to Prissert, and Prissert never relied on any information obtained from Emalfarb, other than public information.  Accordingly, the Court will not disqualify Capital Max as the most adequate lead plaintiff in this case based on the unsupported allegations by Mr. Holst that Prissert engaged in insider trading.  See In re: Peregrine Sys., Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 27690 at *40 (October 9, 2002) (refusing to disqualify a potential lead plaintiff where no evidence was proffered to show that the potential lead plaintiff had received any inside information that was inconsistent with the publicly disseminated material misstatements and omissions).  The Court, of course, reserves the right to change its decision with respect to the appointed lead plaintiff in this case under appropriate circumstances and with appropriate evidentiary support.  However, these circumstances are far from present at the point in the case.

### b. Mr. Holst has not Shown that Capital Max will put its Own Interests First to the Detriment of the Class

Mr. Holst next argues that Capital Max is inadequate because it has argued to advance own interests ahead of those of the class, to the class' detriment.  As evidence, Mr. Holst points to (1) Capital Max's Motion to be Appointed Co-Lead Plaintiff with ABC and (2) Capital Max's arguments in favor of utilizing the Miller class period for purposes of the instant motions.

Holst first argues that Capital Max is inadequate because after vigorously opposing

ABC's initial appointment as lead plaintiff [DE 23], Capital Max later moved, along with ABC, for appointment as co-lead plaintiff [DE 36]. Holst argues that Capital Max's willingness to set aside its misgivings about ABC's adequacy to serve as lead plaintiff in order to achieve appointment itself, evidences an intent to put its own interests above those of the class, rendering it an inadequate lead plaintiff. The Court disagrees. Capital Max represents that after limited discovery many of its worries about ABC's ability to adequately represent the class were assuaged and would be further assuaged if it were allowed to serve as co-lead plaintiff along with ABC. The Court does not see this movement for appointment as co-lead plaintiff to be so egregious as to disqualify Capital Max. Further, the Court declines to speculate as to the reasons behind ABC's decision to withdraw as lead plaintiff itself.

Next, Mr. Holst argues that using the Miller class period would eliminate over $300,000.00 of Capital Max's own claimed losses (under the FIFO method of calculation). Once again, Mr. Holst argues that Capital Max's argument that this class period might be appropriate for determining the most adequate lead plaintiff evidences a willingness to advance its own interests above those of the group. On this point, the Court believes that Mr. Holst simply misunderstood the litigation position of Capital Max. As the Court understood Capital Max's briefing and arguments, its position was merely that the initial class period should be used in determining the most adequate lead plaintiff, not that this class period should be utilized on the merits. Accordingly, the Court does not find that Capital Max has placed its own interests above those of the class to an extent that rebuts Capital Max's status as the presumptively most adequate lead plaintiff in this case.

### c. Capital Max has Standing as an Investment Advisor to Serve as an Individual Lead Plaintiff in this Action

Finally, Mr. Holst argues that Capital Max is inadequate, and lacks standing to sue, because it did not buy or sell Dyadic stock on its own behalf, but rather purchased the stock on behalf of its clients.[8]  According to Mr. Holst, therefore, Capital Max's investors, rather than Capital Max itself are the real parties in interest in this case.  In support of his position Mr. Holst points to In re Network Assos, Inc. Sec. Litig., 76 F. Supp. 2d 1017, 1027-28 (N.D. Cal. 1999) (finding that the proposed lead plaintiff was really a group of separate legal entities that did not act as an individual under the securities laws), In re: Peregrine Sys., 2002 U.S. Dist. LEXIS 27690 at *50 ("'Only money managers that qualify as a 'single person' under the PSLRA may serve as lead plaintiffs.'"), and Smith v. Suprema Specialties, Inc., 206 F. Supp. 2d 627, 633-34 (D. N.J. 2002) ("This Court finds that StoneRidge Investment may not bring the action on behalf of its clients because it did not function as a 'single investor' and it has not submitted any evidence that it received permission to move on its clients' behalf.").[9]  In each of these cases, the district courts declined to appoint a money manager or investment advisor as the lead plaintiff in the consolidated securities class actions at issue.

---

[8] Holst further argues that Capital Max is an inadequate lead plaintiff because the entity itself was a "net gainer."  That is to say, that Capital Max itself sold all of its Dyadic stock prior to the disclosures at issue and had a net gain of $35.60 on its sales of Dyadic stock.  This argument, however, misses the point, as Capital Max is not moving for appointment as lead plaintiff on its own behalf, but rather as an investment advisor on behalf of its clients, who suffered significant losses allegedly due to the Defendants' violations of the securities laws.

[9] Holst also cites to In re Tyco Int'l, Ltd., 236 F.R.D. 62 (D. N.H. 2006), however this case does not stand for the proposition it is advanced for.  The court in Tyco held that whether or not the investment advisor was a "purchaser" within the meaning of the statute, it still had to satisfy the minimal constitutional standing requirements.  Id. at 73.  The court found that because "Voyageur does not allege that it was directly injured by the defendants' alleged misconduct, it lacks standing to sue on its clients' behalf."  Id.  In this case, the Court finds that Capital Max does sufficiently allege constitutional standing and accordingly, Tyco is inapposite.

However, the vast majority of the cases addressing the issue have found that under certain circumstances, investment advisors may be not only permissible lead plaintiffs, but desirable ones as well.  Ezra Charitable Trust v. Rent-Way, Inc., 136 F. Supp. 2d 435, 442 (W.D. Pa. 2001) (appointing an asset manager as lead plaintiff because of its unfettered decision making authority, which made it a "purchaser" under the securities laws with standing to sue in its own name); Weinberg, 216 F.R.D. at 255 (when the investment advisor is also the attorney-in-fact for its clients with unrestricted decision making authority, the investment advisor is considered the 'purchaser' under the federal securities laws with standing to sue in its own name."); In re Goodyear Tire & Rubber Co. Sec. Litig, 2004 U.S. Dist. LEXIS 27043 *24 (N.D. Ohio May 12, 2004) (finding that an investment advisor had standing to sue based on a declaration that "Capital Invest controls and manages the Funds and acts as attorney-in-fact for them.  Capital Invest has full and complete authority to purchase and sell securities for each of the funds, and to institute legal action on their behalf."); In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 299 (D. Del. 2003) ("Although Defendants direct the Court to several cases supporting their position that investment advisors lack standing to sue under the securities law, the Court observes that more recent cases . . . have concluded that investment advisors with authority to make investment decisions for their clients are 'purchasers' for purposes of the securities laws such that they have standing."); In re Espeed, Inc. Sec. Litig., 232 F.R.D. 95, 98 (S.D.N.Y. 2005) ("in order for an investment advisor to attain standing on behalf of investors the transaction in question must have been executed as if by a single person.  Moreover, the advisor must be the attorney in fact for his clients, and he must be granted both unrestricted decision-making authority and the specific right to recover on behalf of his clients."); Cf Sofran v. Labranche & Co., Inc., 220 F.R.D. 398, 403-04

(S.D.N.Y. 2004) (rejecting the argument that because the proposed lead plaintiff was not the beneficial owner of the shares that it could not serve as an adequate lead plaintiff); Newman v. Eagle Building Technologies, 209 F.R.D. 499, 506 (S.D. Fla. 2002) ("The fact that the banks bought the securities on behalf of clients does not mean that the banks are inadequate lead plaintiffs.").

The Court agrees with the majority of the district court decisions on this issue as well as the only Southern District of Florida court to address it. Newman, 209 F.R.D. at 506. The Court further agrees with the courts that have determined that "investment advisors with authority to make investment decisions for their clients are 'purchasers' for purposes of the securities laws such that they have standing." In re DaimlerChrysler, 216 F.R.D. at 299; see also Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1214-15 (1st Cir. 1996); Ezra Charitable Trust, 136 F. Supp. 2d at 442; Monetary Mgmt. Group of St. Louis, Inc. v. Kidder, Peabody, & Co., Inc., 604 F. Supp. 764, 767 (E.D. Mo. 1985); In re Sonus Networks, Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 28272 * 34 (D. Mass. May 10, 2006). In this case, as conceded by Mr. Holst in his briefing and at oral argument, Capital Max is acting as attorney-in-fact for its clients and according to the uncontradicted Prissert declaration, Capital Max had full authority to make the purchase and sale of the Dyadic stocks in this case. Accordingly, the Court finds that Capital Max, as investment advisor to its clients, is the "purchaser" of the Dyadic stock in question in this case, with standing to sue in its own name, on its clients' behalf.

In addition, Capital Max has alleged injury sufficient to meet the constitutional "injury in fact" requirement. Capital Max has a "significant financial interest in attempting to recover [its clients losses] in order to maintain their goodwill and future business." Ezra Charitble Trust, 136

17

F. Supp. 2d at 443. Further, as pointed out by Capital Max, it does in fact suffer direct financial losses as a result of its clients losses. Capital Max is a registered investment advisor, and as such it is compensated for its investment advice based on the performance and value of the portfolios under its management. As a result, losses to a client's portfolio directly translate into losses in income to Capital Max. The Court further finds that Capital Max has demonstrated that it takes this litigation seriously and can effectively represent the class in this matter. Accordingly, because Capital Max is a "purchaser" under the securities laws who has satisfied the minimum constitutional standing requirements, the Court finds that Capital Max has standing to pursue this action in its own name, on its clients' behalf. The Court therefore finds that Mr. Holst has failed to rebut the presumption in favor of Capital Max and therefore Capital Max must be appointed Lead Plaitniff in this action.

### 6. Selection of Lead Counsel

The PSLRA vests authority in the Lead Plaintiff to select and retain lead counsel, subject to the approval of the Court. 15 U.S.C. § 78u-4(a)(3)(B)(v). In this case Lead Plaintiff Capital Max has selected and retained Susman Heffner & Hurst LLP to serve as Lead Counsel and Kozyak Tropin & Throckmorton to serve as Liaison Counsel for the class. Both of these firms have extensive experience in successfully prosecuting complex securities actions and have frequently appeared in major actions in this and other courts.

Because there is nothing to suggest that Movant or its counsel will not fairly and adequately represent the Class, the Court will not interfere with the Lead Plaintiff's selection of counsel at this point in this case. Accordingly, the Court will appoint Susman Heffner & Hurst LLP as Lead Counsel and Kozyak Tropin & Throckmorton as Liaison Counsel for the class.

III. CONCLUSION

Accordingly, for the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Capital Max Inc's Motion to be Appointed Lead Plaintiff, and for Approval of its
   Selection of Lead Counsel and Liaison Counsel [DE 9] is hereby **GRANTED**;

2. Olav C. Holst's Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel
   [DE 16] remains **DENIED**;

6. Class Member Capital Max, Inc. is hereby appointed Lead Plaintiff in the above-styled
   case;

7. The law firm of Susman Heffner & Hurst LLP is hereby appointed as Lead Counsel in the
   above-styled case;

8. The law firm of Kozyak Tropin & Throckmorton shall serve as Liaison Counsel in the
   above-styled case.

   **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this
18th day of April, 2008.

WILLIAM P. DIMITROULEAS
United States District Judge

copies furnished to:

Laurence M. Rosen, Esq.
Michael J. Pucillo, Esq.
Jay W. Eng, Esq.

19

Steven J. Miles, Esq.
Steven J. Toll, Esq.
Daniel S. Sommers, Esq.
Jason M. Leviton, Esq.
Raquel M. Fernandez, Esq.
Jules Brody, Esq.
Maya S. Saxena, Esq.
Julie P. Vinnale, Esq.
Kenneth J. Vinnale, Esq.