UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80948-CIV-DIMITROULEAS

MICHAEL MILLER, individually and on
behalf of all others similarly situated,

Magistrate Judge Rosenbaum

       Plaintiffs,

vs.

DYADIC INTERNATIONAL, INC.,
MARK A. EMALFARB, STEVEN J.
WARNER, HARRY Z. ROSENGART,
 RICHARD J. BERMAN, ROBERT B.
SHAPIRO, GLENN E. NEDWIN,
WAYNE MOOR, and RUFUS GARDNER

       Defendants.

_____/

## ORDER GRANTING DEFENDANTS STEPHEN J. WARNER, HARRY Z. ROSENGART, WAYNE MOOR, AND RICHARD J. BERMAN'S MOTIONS TO DISMISS AND DENYING DYADIC INTERNATIONAL, INC. AND MARK A. EMALFARB'S MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

THIS CAUSE is before the Court upon the Defendants Wayne Moor and Harry

Rosengart's Motion to Dismiss the Amended Consolidated Class Action Complaint [DE 110],

Defendant Stephen J. Warner's Motion to Dismiss Amended Consolidated Class Action

Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) [DE 111], and

Defendants Dyadic International, Inc. and Mark A. Emalfarb's Motion to Dismiss the Amended

Consolidated Class Action Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P.

12(b)(6) [DE 115], all filed on September 15, 2008.  The Court has carefully considered the

1

Motions, the Lead Plaintiff Capital Max, Inc.'s Response to Motions to Dismiss [DE 126] filed

on October 2, 2008, the Defendants' Replies [DE 132, 133, 134, 135] filed on October 14, 2008,

Richard J. Berman's Notice of Adoption of Motion by Defendants Wayne Moor and Harry

Rosengart to Dismiss the Amended Consolidated Class Action Complaint [DE 130] filed on

October 10, 2008, the Amended Consolidated Class Action Complaint [DE 92] filed on June 27,

2008, and is otherwise fully advised in the premises.

## I. BACKGROUND

Lead Plaintiff Capital Max, Inc. ("Capital Max") brings an action on behalf of all persons

who purchased or acquired Dyadic International, Inc. ("Dyadic") securities during the Class

Period between October 29, 2004 and April 23, 2007.  Capital Max alleges that the Defendants

failed to disclose in statements to the Securities and Exchange Commission (SEC) and to the

investing public actual occurrences of, and risks of, financial and operational improprieties by

Dyadic's Asian subsidiaries during the Class Period.

The Amended Consolidated Class Action Complaint ("Amended Complaint") stated that

it gleaned many facts from a report by the law firm Moscowitz & Moscowitz, P.A., which

Dyadic hired to conduct an independent investigation of alleged improprieties at Dyadic's Asian

subsidiaries.  The following factual allegations are based on the Plaintiff's Amended Complaint,

which we must accept as true for the purposes of these motions.  Pertinent factual allegations that

appear in the Moscowitz Report, submitted as an exhibit to Defendants Wayne Moor's and Harry

Rosengart's Motion to Dismiss [DE 110-2], but not in the Amended Complaint, are attributed to

the Moscowitz Report.

2

Dyadic is a biotech company, founded in 1979 by Defendant Mark Emalfarb, that went public in October 2004.  It primarily sells enzymes used in the textile industry.  Dyadic is the sole owner of its Asian subsidiary, Puridet Limited ("Puridet"), which is based in Hong Kong and owns a People's Republic of China ("China") corporation, Dongguan Puridet Softener Company Limited ("Puridet Dongguan").   Defendant Mark A. Emelfarb was the president, CEO, and chairman of the board of directors for Dyadic during the Class Period, and also a director of Puridet.  Defendant Rufus Gardner was a Controller at Dyadic from 2001 to July 2006. Defendant Richard J. Berman was lead director of the Board of Directors and also served on the Audit Committee from January 2005 through the end of the Class Period.  Defendant Wayne Moor served as CFO and Vice President of Dyadic from January 31, 2005 through the end of the Class Period.  Defendant Harry Z. Rosengart was both a director and Audit Committee member from April 2005 through the end of the Class Period.  Defendant Stephen J. Warner was a director throughout the Class Period, and a member of the Audit Committee from January 2005 through the end of the Class Period.

Plaintiff alleges a scheme involving the management of Dyadic's Asian subsidiaries and two dummy corporations designed to help customers in China avoid the Chinese value-added tax (VAT).  In 1998, Dyadic acquired Puridet, whose partners included Robert Smeaton, Raymond Tsang, and Raymond Chih, though Mr. Emalfarb and Dyadic COO David Hooper were aware that Puridet engaged in "off the books" transactions and unofficial ownership of 85% of an Indonesian company, P.T. Pasifik Ichsan.  Mr. Hooper informed Arthur Anderson Hong Kong and Dyadic's Hong Kong counsel that he was aware of Puridet's unrecorded sales and the potential tax liability, and instructed them not to conduct due diligence since he would do it

3

himself.  After the purchase, Mr. Emalfarb, Mr. Gardner, and Mr. Hooper communicated with

each other and Mr. Smeaton of Puridet for several years regarding Puridet, the creation of South

Dragon Detergent Company, or Fushing South Dragon Detergent Company ("South Dragon"),

and formalizing its structure.  The purpose, according to Plaintiffs, was to shield Puridet from the

tax liability of the unrecorded sales by using South Dragon.  Excerpts from some of Mr.

Emalfarb's alleged communications are below:

• October 20, 1998 (from Mr. Emalfarb to Mr. Smeaton): "We spoke last night and over

the telephone you attempted to disclose to me your ways of doing business in China and

your practices in handling various business activities in China in relation to customs

matter, import and export of goods, etc. . . .  Due to the immediate need to continue

ongoing business operations, until further notice you and Raymond Chih are hereby

authorized to continue such customary practices in doing business in the best interests of

the Company." (Amended Complaint, ¶ 36)

• May 17, 1999 (from Mr. Tsang to Mr. Emalfarb): "China Administration Fee.  Starting

from March 1999, a local company begin to handle the local delivery to our Local China

customers either local registered company or HK company with plant in Mainland

China. . . .  The purpose of using, this tool is to build up a safety wall between Taxation

Dept./Custom Dept., and our Factory. The other objective of this middle man is they can

handle some special rebate and discount to customers and attend entertainment with

custom people in some occasions. They can act much more flexible than we can. They

also are our tools of collecting payment in China – local to local policy." (Amended

Complaint, ¶ 37).

- November 8, 2001 (from Mr. Emalfarb to Mr. Smeaton): "we both need to have tight financial and other controls on Puridet (Asia) Limited's business (including but not limited to . . . documentation of the business arrangements between Puridet (Asia) Limited and . . . South Dragon . . . ." (Amended Complaint, ¶ 44).

- September 5, 2002 (from Mr. Emalfarb to Mr. Hooper): "It may be useful exercise . . . to track the following: A/R [accounts receivable] that was in the books on March 31, 2002 to see if the outstanding invoices were (I) paid to Puridet and (ii) the funds were deposited into Puridet's banking account including but not limited to [South Dragon]. This will allow us to double check (a) the receivables are real (if they were collected they are real), (b) what is the length of time from invoicing to collection . . . ." (Amended Complaint, ¶ 50)

- Undated in Complaint (from Mr. Emalfarb to Mr. Smeaton, regarding South Dragon): "this is a situation that last I knew David and you agreed would be cleaned up and you were going to set up a company which can be audited and which we could all be comfortable knowing what their A/R was, what the collections were and what, if any, write offs they were going to have to take, as these in the end would fall back on us [*sic*]." (Amended Complaint, ¶ 57).

- July 29, 2003 (from Mr. Emalfarb to Mr. Smeaton): "You need to have customers along with the supporting documentation that allows you to obtain traditional financing from local banks in Hong Kong and/or China and this means you have to do as you said you were going to do, which as far as I know no one had done yet, restructure the [South]

5

Dragon situation.  We have to be able to have accounting standards that are acceptable to banks who we need to lend money to, potential investors who may be interested in buying Puridet (Asia) Limited and Dyadic who is charged with overseeing our investment." (Amended Complaint, ¶ 58).

• March 16, 2005 (from Mr. Moor to Mr. Emalfarb): "Dyadic's aging has improved and Puridet's has become a little worse.  This is primarily due to the South Dragon receivable which is now all well over 150 days. The balance at year end was about $396,000 (U.S.) and until now . . . only another $39,000 or so has been collected." (Amended Complaint, ¶ 75)

• November 28, 2006 (from Mr. Moor to Mr. Emalfarb, Mr. Smeaton, and others) e-mail stating that the Pui Shing receivable was "a real problem." (Amended Complaint, ¶ 77).

• November 29, 2006 (from Mr. Smeaton to Mr. Moor, copied to Mr. Emalfarb) email explaining the high Pui Shing receivable by stating: "We have post dated cheques in hand of 1,189,000. (. . . here they are useful in our business world).  It is a very common practice to pass cheques onwards." (Amended Complaint, ¶ 77).


Additional communications alleged between Mr. Gardner and Mr. Smeaton indicate that Mr. Gardner was active in attempting to set up the VAT-avoidance scheme, and that Puridet management was actually in control of a purported customer.  According to Plaintiffs, Mr. Emalfarb's laptop computer contained a redlined version of a contract to set up an exclusive distribution arrangement between South Dragon and Puridet Dongguan without indicating that they were related parties; the contract was never executed. (Amended Complaint, ¶¶ 56-57).  In

6

2000, Puridet began making most of its local sales in China to South Dragon. South Dragon would sell Puridet products to Chinese locals wishing to avoid the VAT. South Dragon was a dummy corporation created so that cash sales and sales avoiding the VAT would not appear on Puridet's records. Mr. Hooper and Puridet officers were also engaged in creating a Puridet Dongguan company, in order to further shield Dyadic from the VAT-avoiding scheme and to show acceptable accounting standards to potential lenders.

Plaintiff alleges that several whistleblower e-mails were sent to directors of Dyadic, putting them on notice of improprieties at Puridet. The Amended Complaint notes an anonymous e-mail sent to Mr. Emalfarb in December, 2003, making a series of allegations of improprieties by Puridet management including: bribery and skimming materials by a Puridet Dongguan manager, ownership of an Indonesian company by Mr. Smeaton that owed Puridet a great deal of money, inflation of rent of Puridet's Hong Kong office owned by Mr. Smeaton and Mr. Chih, South Dragon's obligations to Puridet that were at risk, and manipulation of expense accounts. Mr. Emalfarb already knew about most of the allegations, but forwarded the e-mail to M. Gardner asking for more information about the bribery and skimming. Another e-mail in 2004 from the same anonymous whistleblower informed Mr. Emalfarb that Mr. Smeaton was selling Puridet products at low prices to his Indonesian company. The allegations in these e-mails were not investigated

South Dragon abruptly stopped purchasing from Puridet in July 2004, the same time at which Pui Shing Detergent Company ("Pui Shing") began purchasing from Puridet and soon became Puridet's largest account receivable. Pui Shing was another dummy corporation, created and controlled by Puridet officers to take the place of South Dragon in the scheme when the

person who registered South Dragon in China passed away.  To the common knowledge of

Puridet employees, Puridet operated both South Dragon and Pui Shing.

Dyadic hired Defendant Wayne Moor as CFO in February 2005. From the time of his hire

through the end of the Class Period, Mr. Moor made special reports to the Audit Committee

"regarding fraud risks and internal controls at Puridet." (Amended Complaint ¶ 74).  Immediately

upon hire, Mr. Moor sought information regarding the South Dragon and Pui Shing receivables.

In November 2006, Mr. Moor inquired as to whether South Dragon and Pui Shing were the same

company.  He also noted the problem of rising Pui Shing receivables, and received an

explanation from a Puridet officer that Puridet had post-dated checks passed from Pui Shing

customers on to Puridet.  Mr. Moor was informed that this was a common practice in China.

The Moscowitz Report describes another e-mail sent to Mr. Emalfarb in April 2007, days

after Mr. Smeaton passed away.  The e-mail made allegations of self-dealing against Puridet

Dongguan management, including Mr. Tsang, and how a certain manager took bribes to sell

Puridet inventory on the side so customers could avoid paying the VAT.  Mr. Emalfarb

forwarded the e-mail to Mr. Moor, who responded to it by asking for paperwork to support the

allegations and providing his mobile phone number.  The anonymous informant responded to

Moor by alleging that Pui Shing was actually controlled by Mr. Tsang and another Puridet

manager.  It also described how they used Pui Shing to allow customers to buy Puridet products

while avoiding the VAT.  Moor began an inquiry into allegations in these e-mails, while still

exchanging e-mails with the informant.  In another e-mail, the informant stated that South

Dragon customers were transferred to Pui Shing when South Dragon was "bankrupted".  Mr.

Moor had a conversation with Mr. Emalfarb during which he first learned of the 2003-2004

8

whistleblower e-mails.  Mr. Moor informed Dyadic's outside counsel and the Board of Directors.

As stated in the Amended Complaint, the Audit Committee recommended an internal investigation, which led the Board to hire Moscowitz & Moscowitz to conduct the investigation. Mr. Emalfarb, at the request of the Board, took a paid leave of absence from all Dyadic positions pending completion of the investigation.  On April 24, 2007, Dyadic issued a press release announcing the investigation, Mr. Emalfarb's leave of absence, that Dyadic's financial statements could no longer be relied upon, and that Dyadic would voluntarily suspend trading of its stock.  On September 24, 2007, Dyadic announced that the internal investigation revealed that "Mr. Emalfarb had willfully concealed facts relating to material operational and financial improprieties at the Company's Asian subsidiaries," and that Dyadic terminated Mr. Emalfarb as CEO and President. (Amended Complaint, ¶ 25).

Throughout the Class Period, Dyadic made several financial statements and filings with the SEC.  Dyadic also issued press releases and announcements during this time.  Plaintiffs allege that various statements, filings, press releases, and announcements were materially false, misleading, and contained material omissions.  Plaintiffs alleged that Defendants deceived and defrauded the public in an effort to maintain artificially high stock value, to the detriment of the investors in the Plaintiff Class.  The Amended Complaint refers to Mr. Emalfarb, Mr. Gardner, and Mr. Moor as the "Officer Defendants", and accuses them of knowing or recklessly disregarding information that would make Dyadic's financial statements materially false or misleading, or that the information should have prompted inquiry as to whether the financial statements were false or misleading.  Plaintiffs group Mr. Berman, Mr. Rosengart, and Mr. Warner as the "Audit Committee Defendants", and make similar allegations against them.

Plaintiffs assert that the Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  Plaintiffs allege that the Officer Defendants and Audit Committee Defendants were controlling persons and therefore have liability for the misstatements under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).  Dyadic, Mr. Emalfarb, Mr. Moor, Mr. Rosengart, and Mr. Warner have filed Motions to Dismiss [DE 110, 111, 115], and Mr. Berman adopted Mr. Moor and Mr. Rosengart's Motion [DE 130].  Mr. Gardner apparently has not yet been properly served.

## II. DISCUSSION

The Defendants in their separate motions all argue that the Plaintiff's Amended Complaint should be dismissed as to them because they have failed to meet the heightened pleading standards required under the Private Securities Litigation Reform Act of 1995 ("PSLRA").  In particular, they assert that the Plaintiff has failed to assert facts that demonstrate that the Defendants knew or must have known that Dyadic's press releases and SEC filings were false or misleading.  They also maintain that the Moscowitz Report, which the Plaintiff relies upon, contradicts the Plaintiff's allegations.

Plaintiff responds that the Amended Complaint alleges sufficient facts to establish that the Defendants had the proper scienter because they were aware of improprieties at Dyadic's Asian subsidiaries, and therefore knew or were at least severely reckless in not knowing that Dyadic's public statements were false or misleading.

### A. Motion to Dismiss Standard under the PSLRA

Typically, the pleading standard for a civil action is "a short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant challenges a complaint under Rule 12(b)(6) as failing to state a claim upon which relief should be granted, the court need only find that the plaintiff alleged "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007) (abrogating <u>Conley v. Gibson</u>, 355 U.S. 41 (1957)). A claim of fraud has a heightened pleading standard under Rule 9(b). "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." <u>Tello v. Dean Witter Reynolds, Inc.</u>, 494 F.3d 956, 972 (11th Cir. 2007) (quotations omitted). However, the pleading standard for an action under Section 10(b) of the Securities Exchange Act is now governed by the Section 21D(b) of the PSLRA, 15 U.S.C. § 78u-4(b), which has heightened the pleading standards above that of Rule 9(b) by changing the particularity requirements, and changing the standard to plead scienter. <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2508 (2007). The PSLRA states that in securities fraud actions, the plaintiff must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). In addition, when a particular state of mind is required, the "complaint shall, with respect to each or omission alleged to violate this title, state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."
§ 78u-4(b)(2).  A court should rule on a motion to dismiss such a complaint based on the
requirements above. § 78u-4(b)(3).  Recently, the Supreme Court in <u>Tellabs</u> established
prescriptions for this heightened pleading standard requiring a "strong inference" for scienter.
<u>Tellabs</u>, 127 S. Ct. at 2509-10.

      The first of the three prescriptions is that courts must "accept all factual allegations in the
complaint as true."  <u>Id.</u> at 2509.  Secondly, "courts must consider the complaint in its entirety,"
including "documents incorporated into the complaint by reference."  <u>Id.</u>  In doing so, the court
must consider all of the facts alleged collectively to determine if they "give rise to a strong
inference of scienter."  <u>Id.</u>  Finally, courts must compare competing inferences, including
"nonculpable explanations for the defendant's conduct," and determine "if a reasonable person
would deem the inference of scienter cogent and at least as compelling as any opposing inference
one could draw from the facts alleged."  <u>Id.</u> at 2509-10.  Therefore, a claim for a violation of
Section 10(b) of the Securities Exchange Act may only survive if the alleged facts, taken as a
whole with incorporated documents, give rise to an inference that is at least as strong as any other
inference that one may draw.  <u>Id.</u>

###     <u>B. Sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5</u>

Section 10(b) of the Securities Exchange Act makes it unlawful for one

> [t]o use or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so registered . . .
> any manipulative or deceptive device or contrivance in contravention of such rules
> and regulations as the Commission may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

15 U.S. C. § 78j(b).  Under this provision, the SEC promulgated Rule 10b-5, which states that,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The SEC presumes that financial statements that violate generally accepted accounting principles (GAAP) are misleading or inaccurate.  17 C.F.R. § 240.4-01(a)(1).

Although the PSLRA heightened the standard to plead scienter, "it did not change any *substantive* requirements."  Mizzaro v. Home Depot, Inc., 2008 U.S. App. LEXIS 21091, at *10 (11th Cir. October 8, 2008).  The Eleventh Circuit has established that § 10(b) and Rule 10b-5 require a "showing of either an intent to deceive, manipulate, or defraud, or severe recklessness." Id. at *11 (quotations omitted).  A person makes an omission or misrepresentation with severe recklessness if it is "highly unreasonable" and "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).  Therefore, a complaint must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." Mizzaro, 2008 U.S. App. LEXIS 21091, at *11 (quotations omitted).

13

Allegations that defendants held high-level positions and thus had access to financial records at the relevant times are, by themselves, insufficient to meet the scienter requirements.  In re Smith Gardner, Sec. Litig., 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002); In re Republic Services, Inc. Sec. Litig., 134 F. Supp. 2d 1355, 1360 (S.D. Fla. 2001).  Similarly, membership on a company's audit committee similarly does not, by itself, create a strong inference of scienter.  Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 560 F. Supp. 2d 1221, 1241 (M.D. Fla. 2008); In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1341 (S.D. Fla. 1999).

Courts may impute the acts of a corporate officer to the corporation if those acts are "intended to benefit [the] corporation to the detriment of outsiders." In re Spear & Jackson Sec. Litig., 399 F. Supp. 2d 1350, 1361 (S.D. Fla. 2005) (citing In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999)).  The knowledge of those with substantial control over a corporation activities may also be imputed to the corporation.  In re Spear & Jackson, 399 F. Supp. 2d at 1361; see also Schultz v. Applica, Inc., 488 F. Supp. 2d 1219, 1226 n.3 (S.D. Fla. 2007) (imputing knowledge or reckless disregard of CEO to the corporation).

Section 20(a) of the Securities Exchange Act establishes liability for controlling persons, or those "who, directly or indirectly, control[] any person liable under any provision of this title or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly indu ce" the violations.  15 U.S.C. § 78t(a).  Some courts have held that Audit Committee members who sign SEC filings are controlling persons under Section 20(a).  E.g., In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 427 (S.D.N.Y. 2001); see In re Enron Corp. Secs., Derivative, & ERISA Litig., 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003) (citing cases).

## C. Use of the Moscowitz Report in Considering the Motions to Dismiss

A court may consider on a motion to dismiss the "contents of public disclosure documents which are required to be filed with the SEC and are so actually filed," even if the documents are not attached to the complaint but are attached to the motion to dismiss.  Oxford Asset Mgmt. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).  However, a court may only consider such documents for their contents, not for the truths of the matters asserted.  Id.  Thus, a court may consider an SEC filing for whether the filer made particular statements in the filing, but the court cannot to accept those statements as true.

Defendants attached the Moscowitz Report to their Motions to Dismiss. [DE 110-1], and incorporate many of the factual findings and conclusions into their arguments.  Both Defendants and Plaintiffs reference the Moscowitz Report in arguing for and against the Motions to Dismiss.  Defendants rely on Jaharis to argue that the Court should consider the Moscowitz Report in ruling on their Motion to Dismiss without converting it to a motion for summary judgment.  As Defendants point out, this Court has judicially noticed SEC filings that are "central to the plaintiff's claim."  Schultz v. Applica, Inc., 488 F. Supp. 2d 1219, 1223 (S.D. Fla. 2007) (quotations omitted).  In that case, however, this Court judicially noticed the contents of the statements, but did not accept their assertions as true.  Id. at 1225-28, 1230.  The Court compared the contents of the filings with the knowledge that the plaintiffs alleged that the Defendants had.  Id.  The Plaintiffs do not allege that Defendants made false or misleading statements in the Moscowitz Report when it was filed with the SEC.  Had the Plaintiffs not mentioned the Moscowitz Report, their claims would be no more or less sufficient.  In that sense, the Moscowitz Report is not "central to the plaintiff's claim."

15

Even if the Court were to consider the Moscowitz Report, it could only do so for the limited purpose of accepting that Dyadic issued a report detailing the findings of an investigation of fraud at Dyadic.  To consider the Moscowitz Report in the manner that the parties would have the Court do (such as making inferences based on communications described in the report, or based on the report's conclusion that some Defendants did not commit any improprieties) would require accepting statements in the Moscowitz Report as true.  As Jaharis made clear, that would be impermissible in the consideration of a motion to dismiss.  297 F.2d at 1188.

Therefore, the Court will only consider the allegations in the Complaint and the SEC filings that the Court may properly judicially notice, and not the Moscowitz Report.

### D. Defendant Wayne Moor

Mr. Moor argues that the Complaint selectively quoted the Moscowitz Report about e-mails Mr. Moor wrote to inquire about South Dragon and Pui Shing, without mentioning the Moscowitz Report's findings.  Mr. Moor also argues that neither serving as a high-level executive, nor signing the allegedly false or misleading SEC filings, can alone raise a strong inference of scienter.  Mr. Moor disputes that what the Plaintiffs allege that he knew or suspected should have been enough for him to suspect fraud.

Plaintiffs counter that the e-mails that Mr. Moor sent show that he was suspicious.  They also argue that the responses he received, some of which are not alleged in the Amended Complaint, were vacuous and should have signaled to Mr. Moor that further investigation was necessary.  In particular, the Amended Complaint notes that Mr. Moor received an e-mail attributing Pui Shing's high receivable figure to post-dated checks passed on to Puridet.  This method of payment was "highly irregular" and should have demonstrated to Mr. Moor that

16

Puridet was not following GAAP.

When looking solely at the allegations against Mr. Moor in the Amended Complaint, the Court finds that the Plaintiffs have not raised a strong inference that Mr. Moor acted with scienter.  The Amended Complaint alleges that Mr. Moor sent an e-mail soon after becoming Dyadic's CFO in which he expressed concern about South Dragon's high receivable (Amended Complaint ¶ 75).  Whether Mr. Moor received a response with a satisfactory explanation, or any response at all, is not alleged.  The Amended Complaint alleges that Mr. Moor became suspicious or knew that South Dragon and Pui Shing were the same company, because Mr. Moor asked Mr. Tsang in an e-mail whether that was the case (Amended Complaint ¶ 76).  Again, Plaintiffs do not contain any allegation about a response.  According to the Amended Complaint, Mr. Moor sent an e-mail to Mr. Smeaton and Mr. Emalfarb describing the increasing Pui Shing receivable as a "real problem."  The Amended Complaint quotes at length the response that Mr. Smeaton sent to Mr. Moor and Mr. Emalfarb, in which Mr. Smeaton states that the high receivables figure was because Puridet accepted post-dated checks passed on Pui Shing customers to Puridet.  Mr. Smeaton further explained that such method of payment was "useful" in China and Puridet had little choice but to accept them.  Based on these e-mails and responses, the Plaintiffs contend that the Complaint sufficiently raises a strong inference of scienter on Mr. Moor's part.

The Court disagrees.  To allege that Mr. Moor was at least severely reckless, Plaintiff must allege facts that show that his failure to report the risks of fraud or operational improprieties were "highly unreasonable' and exhibited an "extreme departure from the standards of ordinary care." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).  Plaintiffs have

only alleged that Mr. Moor suspected that two of Puridet's customers might have actually been the same company, and that he was concerned about a high receivable in Puridet's financials. The strongest inference is that Mr. Moor did not show an extreme departure from the standards of ordinary care by not investigating fraud based on these two issues, or by failing to publicly disclose the issues as indicators of fraud. That two of Puridet's customers may have been the same company is not a red flag of internal Puridet fraud such that it would have been highly unreasonable for Mr. Moor not to investigate. The high Pui Shing receivable indicated a collection problem, for which he received an explanation. Though it would have been a more prudent route not to accept the explanation and to have investigated the Pui Shing receivable immediately, or to investigate the South Dragon-Pui Shing connection more aggressively, we cannot say that it was highly unreasonable for Mr. Moor sign SEC filings without disclosing these potential problems.

Therefore, the Plaintiffs have not properly stated a claim against Mr. Moor according to the pleading requirements of the PSLRA. Similarly, the Plaintiffs have not stated a claim against Mr. Moor under Section 20(a) of the Securities Exchange Act.

### E. Defendant Harry Z. Rosengart

Plaintiff's allegations against Mr. Rosengart arise solely from his membership on the Audit Committee. Plaintiff alleges that Mr. Rosengart was a member of the Audit Committee beginning in April 2005 through the end of the Class Period (Amended Complaint ¶ 18). The Amended Complaint states that the Audit Committee required Dyadic's CFO to submit to them special reports "specifically regarding fraud risks and internal controls at Puridet," and that Mr. Moor, the CFO at the relevant times, actually did make those reports. In alleging a Section 10(b)

18

and Rule 10b-5 violation, the Amended Complaint did not attempt to attribute any of the statements to the Audit Committee; rather, it stated that the Audit Committee was aware of the dissemination of statements that they "knew or recklessly disregarded was materially false and misleading," or were reckless in "refraining from taking those steps necessary to discover whether those statements were false or misleading." (Amended Complaint ¶¶ 123, 124).  To state a Section 20(a) violation, the Complaint alleges that members of the Audit Committee had "direct and supervisory involvement in the day-to-day operations of the Company," essentially by virtue of their high-level positions. (Amended Complaint ¶¶ 131, 132).  The Amended Complaint does not state what day-to-day operations outside directors would have been involved in.

Mr. Rosengart argues that his membership on the Audit Committee alone cannot create a claim against him.  He contends that the Plaintiff has failed to allege any specific knowledge that should have alerted him to the potential of fraud or operational improprieties at Puridet.  Mr. Rosengart further argues that Plaintiffs can attribute none of the allegedly false or misleading statements in the Complaint to him, as he was an outside director.  To this latter argument, the Plaintiff did not respond.  As Plaintiffs have not attributed any of the statements at issue to the Audit Committee members, the Section 10(b) claims in Count I against Mr. Rosengart must fail. Also, Count I against Mr. Rosengart also fails because the factual allegations do not give rise to a strong inference of scienter, as explained below.

Count II against Mr. Rosengart alleges liability under Section 20(a) as a "controlling person."  Plaintiffs' allegations fail to state this claim against Mr. Rosengart also.  Mr. Rosengart's only connection to the alleged fraud and improprieties at Dyadic is his membership on the Audit Committee.  Prior to <u>Tellabs</u>, courts have held that membership on the Audit

19

Committee, coupled with signing financial disclosure statements can raise an inference that a defendant is a "controlling person" within the meaning of Section 20(a).  E.g., In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 427 (S.D.N.Y. 2001).  Plaintiffs, however, have not even alleged that Mr. Rosengart signed the financial statements or press releases at issue in their Amended Complaint.  Plaintiffs argue that because they have alleged that Mr. Moor specifically reported "fraud risks and internal controls at Puridet," they have met the pleading requirements. However, they have not alleged what specifically Mr. Moor reported to the Audit Committee. Even if this Court were to assume from the pleadings, as Plaintiffs urge us to do, that Mr. Moor reported every signal that might indicate fraud and improprieties at Puridet that he was aware of, the factual allegations would still be insufficient to raise a strong inference of scienter to Mr. Rosengart.  Most significant would be knowledge of Mr. Smeaton's response to Mr. Moor explaining Pui Shing's high receivable being a result of the acceptance of post-dated checks. However, if this signal along with the other signals were not enough to create a strong inference of intent to defraud or severe recklessness in disregarding the possibility of fraud on the part Mr. Moor, as we found above, they logically could not be enough to create a strong inference against Mr. Rosengart.  The facts create a stronger inference that what Mr. Rosengart was specifically alleged to have known was not enough to make him severely reckless in not investigating Puridet's affairs further.

Reading the Amended Complaint as a whole, the claims against Mr. Rosengart are insufficient to raise a strong inference of scienter, and therefore must also be dismissed.

### F. Defendants Richard J. Berman and Stephen J. Warner

Plaintiffs allegations against Mr. Berman arise from his position as lead director of the

Board of Directors, his membership on the Audit Committee, and his designation as one of the "audit committee financial experts" required by the Sarbanes-Oxley Act of 2002.  Mr. Warner also served as a director on Dyadic's Board of Directors, and served in the same capacities as Mr. Berman on the Audit Committee.  Mr. Berman did not submit a separate Motion to Dismiss, but joined in the Motion by Mr. Moor and Mr. Rosengart.  Mr. Warner argues, similar to Mr. Moor and Mr. Rosengart, that the claims fail because they neither sufficiently plead scienter, nor do they attribute any of the statements at issue to him.

The Section 10(b) and Rule 10b-5 claim fail with respect to Mr. Berman and Mr. Warner for the same reasons we found above with respect to Mr. Rosengart – the Amended Complaint does not attribute any of the statements to Mr. Warner or Mr. Berman, and it fails to make factual allegations that give rise to a strong inference of scienter.

Plaintiffs allegations concerning Mr. Berman are essentially the same as that against Mr. Rosengart.  They differ in that Plaintiffs are perhaps alleging greater access or knowledge of the Puridet affairs by virtue of Mr. Warner's and Mr. Berman's positions on the Board of Directors, or perhaps are alleging greater responsibility as designated financial experts on the Audit Committee.  Plaintiffs have not expressly made either allegation.  Merely holding a high-level position is insufficient to raise an inference of scienter. E.g., In re Smith Gardner, Sec. Litig., 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002).  Even when assuming Mr. Berman and Mr. Warner knew whatever knowledge Mr. Moor might have had of the signals Plaintiffs describe, the allegations as a whole do not raise a strong inference of scienter.  As with Mr. Rosengart, if the information was insufficient to state a claim against Mr. Moor, then logically it is insufficient against Mr. Berman and Mr. Warner.  The stronger inference is that Mr. Berman and Mr. Warner

were not severely reckless with regard to the information that Mr. Moor knew.

The allegations as a whole do not raise a strong inference of scienter on the part of Mr. Berman and Mr. Warner, and therefore the Court must dismiss Counts I and II against them.

### G. Defendants Mark A. Emalfarb and Dyadic

Plaintiffs allege that Mr. Emalfarb was aware of Puridet's unrecorded transactions when Dyadic purchased the company in 1998, and that he had knowledge of "significant risks of fraud or operational improprieties at Puridet."[1]   (Amended Complaint, ¶¶ 35, 43, 71, 87).   Plaintiffs detail several communications establishing Mr. Emalfarb's knowledge of Puridet's business activities, and inquiries concerning South Dragon (Amended Complaint, ¶¶ 35-37).   Plaintiffs allege that the communications from Mr. Emalfarb were "thinly-veiled," and their actual purpose was to create and maintain mechanism for shielding Puridet from the VAT-avoidance scheme (Amended Complaint, ¶¶ 37, 44, 50).

Defendants argue that the strongest inference from Plaintiffs allegations are that Mr. Emalfarb attempted to place controls on Puridet, but that Puridet management perpetrated the fraudulent VAT-avoidance scheme despite Mr. Emalfarb's attempts.   Defendants also emphasize that Plaintiffs have made no allegation that Mr. Emalfarb sold any Dyadic stock or received any other direct monetary benefit from the alleged fraud.   Defendants further argue that Plaintiffs allegations of Mr. Emalfarb's knowledge of the fraud are almost entirely concerning South Dragon, sales to which ended in July 2004, months before Dyadic went public, the Class Period began, and Dyadic filed the allegedly false and misleading statements.   Defendants claim that

---

[1]   The knowledge and acts of Mr. Emalfarb, as stated above, may be imputed to Dyadic.   E.g., In re Spear & Jackson Sec. Litig., 399 F. Supp. 2d 1350, 1361 (S.D. Fla. 2005).

Plaintiffs have not sufficiently alleged that Mr. Emalfarb knew that Pui Shing replaced South Dragon in the VAT-avoidance scheme. Defendants also contend that the allegations include actions by Mr. Emalfarb that would be contrary to any intent to participate in the scheme.

The Court finds that Plaintiffs have adequately pleaded a claim against Mr. Emalfarb. The communications described above evince clear knowledge by Mr. Emalfarb that improprieties had been taking place prior to the Puridet purchase and continued through Dyadic's ownership of the subsidiary. Plaintiffs have alleged that Mr. Emalfarb was aware of Puridet's unrecorded transactions, and that language in written communications, such as "ways of doing business in China" and "you and Raymond Chih are hereby authorized to continue such customary practices", are purposely vague in order to disguise Mr. Emalfarb's knowledge. (Amended Complaint, ¶ 36). Mr. Emalfarb also allegedly sent an e-mail to Mr. Smeaton stating that "you were going to set up a company which can be audited," indicating knowledge of an attempt to shield Puridet. (Amended Complaint ¶ 57). Mr. Tsang's May 17, 1999 e-mail to Mr. Emalfarb is clearer in describing the scheme (e.g., "build up a safety wall between Taxation Dept./Custom Dept., and our Factory" ). (Amended Complaint, ¶ 37). Plaintiffs specifically claimed that Mr. Gardner made special financial records of Puridet matters for Mr. Emalfarb.

Defendants arguments that Mr. Emalfarb took "numerous steps to control the risk of improprieties" fail because Mr. Emalfarb's actions may just as easily be explained in other ways, such as an intent to shield himself, Dyadic, and Puridet from the appearance of improprieties.[2] For example, Defendants insist that by stating that Mr. Emalfarb forwarded whistleblower e-

---

[2] Many of Defendants arguments are based on facts in the Moscowitz Report. For the reasons above in II.C, the Court will consider those facts that appear in the Amended Complaint.

mails to financial officers and auditors, Plaintiffs have raised a compelling inference that Mr.

Emalfarb was acting without scienter for fraud.  However, Plaintiffs have also alleged that Mr.

Gardner, Dyadic's controller and the person to whom Mr. Emalfarb forwarded the 2003-2004

whistleblower e-mails, showed specific knowledge of the VAT-avoidance scheme and reported

to Mr. Emalfarb regarding South Dragon.  Under these facts, it is more likely that Mr. Emalfarb

forwarded those e-mails to Mr. Gardner not to inform him of the South Dragon situation, which

Plaintiffs claim both were aware of, but to make Mr. Gardner aware of the many other allegations

in the e-mails.  Defendants also contend that the use of auditors shows Mr. Emalfarb's intent to

place controls on a company.  However, when looked at in light of Mr. Emalfarb's alleged

knowledge of improprieties at Puridet involving South Dragon, the use of auditors may indicate

an attempt to verify Puridet's appearance of propriety.  They may also indicate Mr. Emalfarb's

attempt to address risks of the type in whistleblower e-mails, such as skimming by Puridet

management.

That Plaintiffs do not allege that Mr. Emalfarb gained, or attempted to gain, any personal

enrichment from the improprieties does not defeat the complaint.  See Druskin v. Answerthink,

Inc., 299 F. Supp. 2d 1307, 1323-24  (S.D. Fla. 2004) (listing "particularized allegations of

profits by virtue of dealing through related companies or exercising stock options" as a relevant

fact to determine if Defendant had scienter for fraud, but also stating that each of the six factors

stated need not be present).  Defendants cite In re Sportsline.com Sec. Litig. and Druskin to state

that Plaintiffs must plead more than "supporting the artificially inflated price of its securities" as

a motive in order for a claim to be sufficient.  Those cases analyzed several factors including

motive, found the complaints to be deficient in all or most of them, and subsequently found that

scienter was inadequately pleaded.  In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004); Druskin, 299 F. Supp. 2d at 1324-25.  This case is distinguishable from Druskin, in that here, Plaintiffs have made specific allegations that the Defendants were confronted with an ongoing fraud, that Defendants ignored "red flags", and that there was a significant price decline following disclosure by Dyadic.  See Druskin, 299 F. Supp. 2d at 1323-25 (noting the lack of these factors in the plaintiffs' complaint).  This case is also distinguishable from Sportsline.com in that the Plaintiffs here specifically allege that the Defendants knew or were reckless in not knowing that misstatements were made, that these Defendants were participants in the fraud, or at least received clear warnings of improprieties. Sportsline.com, 366 F. Supp. 2d at 1173-74.

Defendants strongest argument that the Plaintiffs have failed to plead scienter is the lack of allegations showing specific knowledge by Mr. Emalfarb's that Pui Shing was South Dragon's successor in the alleged fraud.  While the Amended Complaint does not list any specific communication that would give Mr. Emalfarb that specific knowledge, the Court finds that the allegations support a strong inference that Mr. Emalfarb was at least severely reckless in not knowing about Pui Shing's role in the VAT-avoidance scheme, and certifying the SEC filings.  If Mr. Emalfarb was aware that South Dragon was a dummy corporation, as Plaintiffs allege, then the timing of the sales ending to South Dragon and the sales beginning and increasing to Pui Shing should have alerted Mr. Emalfarb to the possibility that the scheme was continuing with Pui Shing rather than South Dragon.  This is especially so since Mr. Emalfarb would have been aware of the previous fraud, and aware that Mr. Smeaton, who had allegedly set up the VAT-avoidance scheme, was still running Puridet.  To not have put two and two together under these

facts would have been "an extreme departure from the standards of ordinary care", and one may easily infer Mr. Emalfarb's knowledge of the continuation of the fraud.  The strongest inference from these alleged facts is that Mr. Emalfarb, and thereby Dyadic as well, was at least severely reckless to continue signing and certifying the SEC filings without indicating the possibility of fraud or improprieties involving Puridet, South Dragon, and Pui Shing.

### III. CONCLUSION

Accordingly, is **ORDERED AND ADJUDGED** as follows:

1.  Defendants Wayne Moor and Harry Rosengart's Motion to Dismiss the Amended Consolidated Class Action Complaint [DE 110] is hereby **GRANTED**;

2.  Defendant Stephen J. Warner's Motion to Dismiss Amended Consolidated Class Action Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) [DE 111] is hereby **GRANTED**;

3.  Defendants Dyadic International, Inc. and Mark A. Emalfarb's Motion to Dismiss the Amended Consolidated Class Action Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) [DE 115] is hereby **DENIED**;

4.  Richard J. Berman's Notice of Adoption of Motion by Defendants Wayne Moor and Harry Rosengart to Dismiss the Amended Consolidated Class Action Complaint [DE 130] is hereby **APPROVED**;

5.  The above-styled case is hereby **DISMISSED without prejudice** as to Defendants Wayne Moor, Harry Rosengart, Richard J. Berman, and Stephen J. Warner only;

6.  Plaintiffs shall have until December 22, 2008 to amend their complaint.

**DONE AND ORDERED** in Chambers, at Fort Lauderdale, Broward County, Florida this

20th day of November, 2008.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Counsel of record