## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MICHAEL MILLER, individually and on behalf )
of all others similarly situated, )
                                )
            Plaintiff, )
                                )     Case No. 07-80948-CIV-Dimitrouleas
      v. )
                                  )
DYADIC INTERNATIONAL, INC., RICHARD )
J. BERMAN, MARK A. EMALFARB, RUFUS )
GARDNER, WAYNE MOOR, HARRY Z. )
ROSENGART, and STEPHEN J. WARNER, )
                                  )
           Defendants. )
                                  )

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Lead Plaintiff, Capital Max, Inc. ("Capital Max"), alleges the following based upon investigation by its counsel, which included a review of Defendants' public documents, conference calls, and announcements, Defendants' filings with the Securities and Exchange Commission ("SEC"), wire and press releases regarding Dyadic International, Inc. ("Dyadic" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Lead Plaintiff brings this action under the Securities Exchange Act of 1934 on behalf of all persons who purchased or acquired Dyadic securities from October 29, 2004, through April 23, 2007 (the "Class Period").

2.      This Complaint stems from Defendants' failure to disclose the risks of and the actual occurrence of significant operational and financial improprieties at Dyadic's Asian

subsidiaries during the Class Period. Specifically, the largest customer of Dyadic's Asian subsidiaries was controlled by the subsidiaries' management, including the managing director, who died in early 2007. The management-controlled customer purchased products from the Asian subsidiaries and then re-sold them on a cash basis to businesses in mainland China in order to avoid Chinese reporting and sales tax requirements. Despite the Asian subsidiaries' history of financial impropriety and questionable business dealings, in conjunction with the increased fraud risk of operating in an emerging economic nation such as China, Dyadic never took steps to heighten its internal controls over its Asian subsidiaries and failed to inform the public of the risks.

3.     After an internal investigation, Dyadic fired its president and CEO, Defendant Mark Emalfarb, concluding that he "willfully concealed facts" relating to the Asian subsidiaries' improprieties.

4.     In light of the Asian subsidiaries' business practices and Dyadic's potential tax liabilities, Dyadic abandoned its Asian operations, which was had historically posted the greatest number of sales for any Dyadic business segment.

5.     Trading of Dyadic securities was halted at Dyadic's request on April 23, 2007. The American Stock Exchange ("AMEX") filed an application with the SEC to delist Dyadic stock on January 30, 2008, and the stock was automatically delisted effective April 29, 2008.

6.     Because of Defendants' misstatements and omissions, the price of Dyadic securities was artificially inflated during the Class Period, and, therefore, investors who purchased or acquired Dyadic securities during that time were damaged. For instance, on the day before the truth began to be revealed regarding Dyadic's Asian operations (and trading in the

stock was halted), Dyadic shares closed at $5.30. On the first day trading of Dyadic shares was reopened on the "Pink Sheets," January 17, 2008, Dyadic closed at just $.50 per share.

## JURISDICTION AND VENUE

7.      Lead Plaintiff's claims are brought pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

8.      The Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Dyadic maintains its principal executive offices at 140 Intracoastal Pointe Drive, Suite 404, Jupiter, Florida, 33477, and many of the acts and transactions alleged herein, including the preparation and dissemination of statements containing materially false and misleading information and omissions of material fact, occurred in substantial part in this District.

10.      In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities exchange, to knowingly disseminate their false and misleading statements regarding Dyadic.

## PARTIES

11.      Lead Plaintiff, Capital Max, is an investment advisor located in the Southern District of Florida. On April 18, 2008, the Court appointed Capital Max as Lead Plaintiff in this action [DE 73]. As set forth in its certification attached to Capital Max's Supplemental

Memorandum of Law in Support of Its Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel [DE 65-5] and hereby incorporated by reference herein, Lead Plaintiff purchased Dyadic common stock during the Class Period and was damaged thereby.

12.     Defendant Dyadic is a public biotech company, incorporated in Delaware and based in Jupiter, Florida, with operations in the United States, Hong Kong and mainland China, Poland, and the Netherlands. Dyadic was originally founded in 1979 by Mark Emalfarb, and went public in October 2004 by way of a reverse merger. Dyadic's revenues are generated primarily through its sale of enzymes used in the textile business. Its securities were traded publicly on the AMEX under the symbol DIL from May 2005 until trading was halted on April 23, 2007.

13.     Puridet (Asia) Limited ("Puridet") is based in Hong Kong and is a wholly-owned Asian subsidiary of Dyadic. Puridet manufactures and distributes textile enzymes in Asia, owns a People's Republic of China (PRC) corporation, Dongguan Puridet Softener Company Limited ("Puridet Dongguan"), and was founded by Robert Smeaton, Raymond Tsang, and Raymond Chih. Puridet's sales accounted for 40% of Dyadic's total sales in 2005 and 2006, and its financial results were incorporated into Dyadic's publicly filed financial results during the Class Period.

14.     Defendant Richard J. Berman ("Berman") was lead director of the Board of Directors and a member of the Audit Committee from January 2005 through the end of the Class Period. Berman was designated one of the "audit committee financial experts" required by the Sarbanes-Oxley Act of 2002. (Dyadic Schedule 14A Proxy Statement, May 2, 2005, at 7.)

15.     Defendant Mark A. Emalfarb ("Emalfarb") was president, CEO, and chairman of the board of directors of Dyadic at all relevant times during the Class Period. Emalfarb was also a director of Puridet.

16.     Defendant Rufus Gardner ("Gardner") was the Controller at Dyadic from 2001 through July 2006.

17.     Defendant Wayne Moor ("Moor") was CFO and Vice President of Dyadic from January 31, 2005, through the end of the Class Period, and was a manager of Puridet during the Class Period.

18.     Defendant Harry Z. Rosengart ("Rosengart") was a director of Dyadic beginning in April 2005 and a member of the Audit Committee from on or about April 2005 through the end of the Class Period.

19.     Defendant Stephen J. Warner ("Warner") was a director of Dyadic beginning in October 2004 and a member of the Audit Committee from January 2005 through the end of the Class Period. Warner was designated one of the "audit committee financial experts" required by the Sarbanes-Oxley Act of 2002. (Dyadic Schedule 14A Proxy Statement, May 2, 2005, at 7.)

20.     Collectively, Defendants Emalfarb, Gardner, and Moor are referred to herein as the "Officer Defendants."

21.     Collectively, Defendants Berman, Rosengart, and Warner are referred to herein as the "Audit Committee Defendants."

## SUBSTANTIVE ALLEGATIONS

22.     During the Class Period, Defendants made materially false and misleading statements to the SEC and the investing public regarding the operations of its Asian subsidiaries. Those misstatements and omissions eventually led to a self-imposed trading halt on Dyadic

securities on AMEX on April 23, 2007, an internal investigation, the termination or resignation of most of Dyadic's senior management, and a precipitous drop in the price of Dyadic stock.

**The Truth Revealed**

23.     Defendants first disclosed that there were improprieties at its Asian subsidiaries and that its SEC filings "should no longer be relied upon" in the following press release on April 24, 2007:

> Dyadic Announces Discovery of Potentially Material Operational and Financial Improprieties at its Hong Kong and Mainland China Operations
>
> JUPITER, Fla. – April 24, 2007
>
> Dyadic International, Inc. (AMEX: DIL) today announced that it has discovered potentially material operational and financial improprieties at its Hong Kong and mainland China operations following the recent death of the managing director of its Hong Kong operations.
>
> The Company's audit committee, upon the advice of counsel, has initiated an independent investigation of the facts surrounding these improprieties. Pending the completion of the investigation, the Company's chief executive officer and chairman of its board of directors, Mark A. Emalfarb, will be on a leave of absence from all of his positions and offices with the Company, and he has also taken a leave of absence from his position as a member and chairman of the board.
>
>              . . . .
>
> As a result of these improprieties, the Company will not be in a position to make a timely filing with the Securities and Exchange Commission of its Quarterly Report on Form 10-QSB for the quarter ended March 31, 2007, nor will it be in a position to announce its operational and financial results for the quarter. The Company expects to file the Quarterly Report as soon as practicable.
>
> On April 23, 2007, the Company's board of directors, upon the recommendation of the audit committee, determined that the Company's previously filed financial statements, including those contained in its Annual Reports on Form 10-KSB and Quarterly Reports on Form 10-QSB, as filed with the SEC, should no longer be relied upon.
>
> The Company has notified and is working with Ernst & Young LLP, its independent registered public accounting firm, to address these matters.

The Company is in discussions with the American Stock Exchange regarding the continued listing of its shares; however, it anticipates that the Exchange may, in accordance with its rules, initiate delisting proceedings against the Company. Furthermore, the Company has been notified by the Exchange that the trading in its shares will continue to be halted until such time as additional information regarding these matters is publicly available.

24.     On May 21, 2007, the Company released the following update to its internal investigation:

Dyadic Updates Progress of Its Investigation

Company Announces its intent to abandon its Hong Kong and Mainland China operations

Company reports receipt of delinquency notice from the American Stock Exchange

JUPITER, Fla. – May 21, 2007

Dyadic International, Inc. (AMEX: DIL) today provided an update on the progress of its independent investigation into the potentially material operational and financial improprieties at its Hong Kong and mainland China operations announced on April 24, 2007.

Following the recent death of the managing director of the Company's Asian subsidiaries, the Company received anonymous "whistleblower" communications alleging a number of improprieties perpetrated against the subsidiaries by the subsidiaries' management. The Company's investigation, which is being conducted under the direction of independent legal counsel engaged by the Audit committee, thus far has revealed that the Asian subsidiaries' largest customer was secretly controlled by the Asian subsidiaries' management, including the deceased managing director. This customer, which represented approximately 25% of the Asian subsidiaries' reported net sales for 2006 of approximately $6.1 million and approximately 33% of their net accounts receivable of approximately $1.7 million as of December 31, 2006, purchased products from the Asian subsidiaries which it subsequently re-sold on a cash basis to businesses in mainland China, apparently allowing these businesses to avoid Chinese reporting and sales tax requirements.

Dyadic's Board of Directors has authorized the Company to abandon its Asian operations. To that end, the Company is currently working with its independent registered public accounting firm, Ernst & Young LLP, to determine the proper accounting treatment to record the effect of abandoning these

operations. As of December 31, 2006, the assets of its Asian subsidiaries were approximately $4.7 million, consisting of approximately $1.8 million of goodwill and approximately $2.9 million of receivables and other assets, and liabilities were approximately $1.0 million. The Asian subsidiaries reported a net loss for 2006 of approximately $43,000.

Mark A. Emalfarb, the Company's Chief Executive Officer and Chairman of its Board of Directors, remains on a leave of absence from all of his positions and offices with the Company pending completion of the independent investigation.

The Company expects to complete the independent investigation and finalize the accounting treatment for abandoning the operations of its Asian subsidiaries by September 1, 2007, although there can be no assurances in this regard. The Company intends to provide further updates as the investigation progresses.

As previously announced, the Company's financial statements, including those contained in its Annual Reports on Form 10-KSB and Quarterly Reports on Form 10-QSB, as previously filed with the SEC, should no longer be relied upon. The Company has suspended indefinitely the use of its previously filed registration statement on Form S-3 covering the resale of shares of its common stock by investors who participated in the Company's private placement completed on December 1, 2006. During this suspension period, the Company is obligated to pay liquidated damages of approximately $130,000 per month beginning on May 23, 2007, up to a maximum of $1.3 million.

On May 17, 2007, the Company received notice from the American Stock Exchange that the Company is currently in violation of the Exchange's continuing listing standards specified in Sections 134 and 1101 of the Exchange's Company Guide because the Company has yet to file with the SEC its quarterly report on Form 10-QSB for the quarter ended March 31, 2007. The notice further indicates that the Company must submit a plan to the Exchange by June 18, 2007, advising the Exchange of action it has taken, or will take, that will enable the Company to regain compliance with these continued listing standards by no later than November 16, 2007.

The Company intends to submit such a plan to the Exchange in a timely manner and take such actions necessary to regain compliance with these continued listing standards. The Exchange will evaluate such plan and determine whether or not the Company has made a reasonable demonstration of an ability to regain compliance with these continued listing standards. If the plan is accepted by the Exchange, the Company will remain listed during the plan period, during which time the Company will be subject to the Exchange's periodic review to determine whether it is making progress consistent with the plan. If the Company does not submit a plan or submits a plan that is not accepted by the Exchange, or

if it does not regain compliance with the continued listing standards or make progress consistent with the plan, the Company will become subject to delisting proceedings.

The halt on trading in the Company's shares that went into effect, at the request of the Registrant, on April 23, 2007, has been and, at the direction of the Exchange, will continue to be in effect until such time as the Company has filed with the SEC its quarterly report on Form 10-QSB for the quarter ended March 31, 2007.

25.     On September 24, 2007 the Company announced that Defendant Emalfarb was

terminated as CEO and president and asked to resign from the board because the independent

investigation determined that he had "willfully concealed facts relating to the material

operational and financial improprieties at the Company's Asian subsidiaries":

Dyadic Announces Termination of Employment of its President and CEO, Mark A. Emalfarb

Jupiter, Fla. – September 24, 2007

Dyadic International, Inc. (<u>AMEX: DID</u> announced today that on September 20, 2007, a special committee (the "Special Committee") of the board of directors (the "Board") of Dyadic International, Inc. (the "Company"), acting upon the recommendation of the audit committee (the "Audit Committee") of the Board, authorized the termination for cause by the Company of the employment of Mark A. Emalfarb as the Company's Chief Executive Officer and President under his employment agreement dated as of April 1, 2001, as amended by the first amendment to employment agreement dated as of March 16, 2006. This termination was effectuated on September 24, 2007. Mr. Emalfarb previously terminated his voluntary leave of absence from the Board on September 5, 2007, and remains a director of the Company, although the Company now has requested that Mr. Emalfarb voluntarily resign from the Board immediately.

The Company's action was taken based upon initial information discovered by management and after an independent investigation was conducted at the direction, and under the supervision, of the Audit Committee (the "Investigation"). The Investigation, carried out by independent legal counsel, revealed that Mr. Emalfarb had willfully concealed facts relating to material operational and financial improprieties at the Company's Asian subsidiaries.

26.     The announcement went on to reveal further details of the improprieties at the

Asian subsidiaries:

As reported in the Company's previously filed Current Reports on Form 8-K dated April 23, 2007 and May 17, 2007, the Company became aware of material operational and financial improprieties at its Asian subsidiaries, through which its Hong Kong and mainland China operations were conducted, following the death of the managing director of its Asian subsidiaries. As a result of the completion of the Investigation into the operations of the Company's Asian subsidiaries, it has been concluded that the Asian subsidiaries' largest purported customer was secretly controlled by the Asian subsidiaries' management including the deceased managing director. It was determined, among other things, that this purported customer purchased products from the Company's Asian subsidiaries which the purported customer subsequently re-sold on a cash basis to businesses in mainland China, apparently allowing certain of these businesses to avoid Chinese reporting and VAT requirements. The Investigation revealed that certain members of the former management of the Company and the management of the Asian subsidiaries had willfully concealed facts relating to these material operational and financial improprieties by the Company's Asian subsidiaries. The Company has abandoned its Asian operations because of its concerns over these material operational and financial improprieties.

27.     On or about May 14, 2007, Dyadic's Audit committee hired Moscowitz & Moscowitz, P.A., a Florida-based law firm made up of former federal prosecutors, to conduct an independent investigation of the alleged improprieties at its Asian subsidiary and to determine whether any officers or employees at Dyadic participated in these improprieties and/or failed to disclose them.

28.     On or about August 15, 2007, Moscowitz & Moscowitz submitted a report of its investigation (the "Moscowitz Report") to the Audit Committee, a copy of which was released to the public on March 4, 2008.

**Puridet, South Dragon, and Pui Shing**

29.     In 1998, Dyadic entered into negotiations to purchase Puridet to serve as its base of Asian operations. Defendant Emalfarb negotiated with Robert Smeaton and the other partners of Puridet, and discovered at this time, through David Hooper ("Hooper"), Dyadic's COO, that it was clear that Puridet was engaging in "off the books" and cash transactions with its customers in China.

30.     Hooper went to Hong Kong in March 1998, to do due diligence and to begin the transaction. In his due diligence report to Dyadic, entitled "Puridet, Information Gathered in Visit of March 23-25, 1998," Hooper wrote that audited statements for the fiscal year ended March 31, 1997, showed sales of HK$ 43 million with profits before tax of HK$ .5 million. He then noted additional sales from statements he had been given and provided a section entitled "Actual including shadow accounts." These accounts were off books transactions made to evade Chinese/Hong Kong value added taxes, or "VAT."

31.     Hooper's due diligence also noted that "regarding Puridet Dongguan's customers, 'PRC -80% - 30-40 within 80 km of plant. . . . Most customers pay cash with order,'" and that "[i]t also describes the company in Indonesia, P.T. Pasifik Ichsan as follows: 'Company is 100% owned by local distributor. Side letter that Puridet owns unofficially 85%.'"

32.     Hooper also made clear to Arthur Andersen Hong Kong that Dyadic did not want Andersen to participate in the due diligence exercise prior to acquisition. The memorandum, dated June 11, 1998 (sent to Hooper and maintained in the Puridet files at Dyadic), states that Andersen raised issues of tax liability issue in China, both VAT and EIT. Hooper's response was as follows:

> David stressed that he is fully aware of [tax issues]. However, he does not need our assistance in determining the tax implications for the two entities and to quantify the tax liability. The acquiring group will determine the risk of such tax exposures on the two entities and will seek indemnification and warranties from the seller as appropriate. In addition, they are fully aware of the tax implications, both Hong Kong and China on the unrecorded sales. No audit due diligence is required even though the acquirer is purchasing the shares of Puridet of the BVI Co."

In so doing, Dyadic disclosed the "unrecorded" sales to Andersen, although it did not want Andersen to conduct further inquiry into them.

33.     Dyadic retained Hong Kong counsel to assist in the transaction. However, again, Hooper excluded from the engagement any assistance regarding legal liabilities. A memo to Hooper from Gavin Nesbitt, Dyadic's Hong Kong counsel, also dated June 11, 1998, noted that Hooper did not want "a formal legal due diligence exercise and that [he] would [himself] endeavor to get further material information." But Hooper knew there were "problems" with Puridet, so there was no purpose to due diligence.

34.     Hooper relayed all information in 1998 regarding the off-book accounts and improperly constructed transactions to avoid Chinese/Hong Kong tax reporting to Emalfarb, which is confirmed by Hooper himself, and the documents dealing with the Puridet acquisition – drafts, memoranda, email communications, etc.

35.     For example, Emalfarb sent a purposefully vaguely worded letter to Smeaton at the time of the Puridet acquisition. That letter, dated October 20, 1998, the day before the closing of the acquisition transaction (sent by fax from a hotel in Shanghai) states, as follows:

> We spoke last night and over the telephone you attempted to disclose to me your ways of doing business in China and your practices in handling various business activities in China in relation to customs matter, import and export of goods, etc.
>
> As we have previously agreed the sale and purchase of the Business and Business Assets under the Business Sale Agreement should be effective on October 19, 1998 as planned.
>
> Due to the immediate need to continue ongoing business operations, until further notice you and Raymond Chih are hereby authorized to continue such customary practices in doing business in the best interests of the Company.
>
> A review of practices will be discussed and finalized at the next board meeting of Puridet (Asia) Limited.

36.     Emalfarb continued thinly-veiled communications concerning the handling of cash transactions and tax issues to Puridet. Their language shows that their purpose was to find a mechanism for shielding Puridet from liability for such transactions. For example, on May 17,

1999, the following e-mail was sent by Raymond Tsang to Demirgian, the Dyadic Controller who preceded Gardner, with copies to Hooper, Emalfarb and Smeaton:

> 4. China Administration Fee. Starting from March 1999, a local company begins to handle the local delivery to our Local China customers either local registered company or HK company with plant in Mainland China. We offer 2.5% on the sales of local delivery in China to them as their remuneration. The purpose of using, this tools is build up a safety wall between Taxation Dept./Custom Dept., and our Factory. The other objective of this middle man is they can handle some special rebate and discount to customers and attend entertainment with custom people in some occasions. **They can act much more flexible than we can.** They also are our tools of collecting payment in China – local to local policy. In February 1999, we paid them HK$38,000.00 for their initial established expenses and handling special discount with customer.

(Emphasis added).

37.     Based on the allegations of ¶¶ 29–36, above, it is clear that Defendant Emalfarb knew that there was a significant risk of fraud and operational irregularities at Puridet in 1998–1999. It is also clear that Emalfarb knew that Dyadic's internal controls were insufficient to prevent Smeaton and Puridet from violating Generally Accepted Accounting Principles and Standards, violating operational directives, or committing fraud.

38.     Sometime in 2000, Puridet began to book most of its local sales in China into an entity it called South Dragon Detergent Company, or Fushing South Dragon Detergent Company, often referred to by Puridet people as "SD" or "South Dragon." South Dragon was an entity made to appear as a customer so that both cash transactions and transactions in which customers wanted to avoid their VAT obligation would not appear on the books of Puridet.

39.     An internal document from Raymond Tsang's (a Puridet partner) computer memorializes a meeting held on May 5, 2000, with Mr. Zhai, the import/export consultant used by Puridet who came to be used as the nominal head of South Dragon. The memo notes three objectives: 1) "Make the Operation of Internal Sales in China and South Dragon more flexible;" 2) "Eliminate the risk of Dongguan Puridet Softener Co., Ltd.;" and 3) "Deal with VAT invoice

transaction and VAT refund." The memo sets forth alternatives to accomplish these objectives, including: "Zhai set up local factory and Puridet/Tsang contract his factory to produce the goods in China and sell in China – solve the problem of VAT invoice and VAT refund and name difference." Discussing this alternative, the memo notes: "Zhai thinks US partner can accept this method as there is a contract (US loves contract) and more flexible for us to run the business and safe."

 40. In October 2001, Gardner, Dyadic's then controller, traveled to Hong Kong with Hooper where he was briefed by Smeaton and others, about Puridet's operations and, specifically, about South Dragon. Gardner's notes from this time state:

> South Dragon-Robert set up for them to import raw material to avoid VAT and have Puridet manufacture for them. Puridet charges 95% sale price, SD charges their customers 100% with no VAT. They cannot do export sales. However, a Chinese customer may request a VAT invoice so that they can sell with VAT and be clean with government. We honor that request and therefore we give up 6% or whatever the rate is for those sales. We bill SD for 95% and SD bills this customer 94% sales with 6% tax; hence SD loses money here as they pay the VAT to government.

> To continue with South Dragon and Puridet's business arrangements: I was told that South Dragon has been in existence since the 1st qtr. of 2000, established to shoulder VAT and other China government requirements so that Puridet would be a clean importer of raw materials and exporter of finished products.

 41. South Dragon activity went on until July 2004, and Gardner received monthly reports from Hong Kong accountant Paul W.C. Ho & Co. which pointed out and analyzed the significance of the South Dragon receivable. Both Hooper and Gardner communicated openly and freely with Emalfarb about all Puridet matters, including South Dragon. Gardner routinely made notebooks for Emalfarb with current financial information. Besides receiving reports from them, Emalfarb also communicated directly with Smeaton in e-mails and in many telephone calls.

42.    Based on the allegations in ¶¶ 38–41, it is clear that Emalfarb and Gardner knew that there were significant risks for fraud or operational irregularities at Puridet in 2000–2004. It is also clear that Emalfarb and Gardner knew that Dyadic's internal controls were insufficient to prevent Smeaton and Puridet from violating Generally Accepted Accounting Principles and Standards, violating operational directives, or committing fraud.

43.    On November 8, 2001 (shortly after Gardner and Hooper's return from Hong Kong), Emalfarb wrote Smeaton regarding controls that should be established at Puridet, stating that,

> we both need to have tight financial and other controls on Puridet (Asia) Limited's business (including but not limited to (I) Accounts Receivables, Inventory, Bank and other Cash Accounts as well as the accounts payables, (ii) documentation of the business arrangements between Puridet (Asia) Limited and (a) JV with Flemming and his company, (b) **South Dragon** and (c) the Indonesian Business.

(Emphasis added).

44.    Following his October 2001 trip, Gardner became actively involved in communications with Smeaton regarding South Dragon. On November 11, 2001, Smeaton sent an e-mail to Gardner, with a copy to Hooper (in a message regarding sales figures), that again made clear that Puridet ran and kept the books for South Dragon: "I think I will keep Henry [Wong, a Puridet accountant] and put him in charge of keeping the South Dragon accounts updated, particularly the accounts receivable info that the salesmen are complaining is not fast enough updated, and a more clearer stock tracking system."

45.    On November 19, 2001, Smeaton e-mailed Gardner, "Still working on the SD numbers as there is actually march 2000 until now to tidy up."

46.    On November 27, 2001, Smeaton wrote Gardener and Hooper that,

> We have a very accurate set of accounts with south Dragon (they have been checked four times). South Dragon owes Puridet $HK 600,000 in toll

manufacturing fees as at the end of the October, how do you want to deal with this?

47.    Gardner responded, on November 29, 2001, stating:

To have accurate accounts and financial statements for South Dragon is a key accomplishment that you, Raymond and Henry have achieved. I would still like to see these statements each month if that could be arranged. As to the accumulated profits of $HK600,000, in my opinion, November invoicing from Puridet to South Dragon should be issued since we only have two months remaining to record the catch-up before year end. **I believe we should consider a reduction in the 5% difference between South Dragon's invoicing to the customer and the Puridet invoice amount to SD. This would minimize the SD profit and cause Puridet sales to reflect amounts closer to actual.** Additionally, it would create a timing problem for the Puridet invoicing cut-off each month if the SD income statement was prepared before a month's sales were closed. Each month's SD profit would be invoiced in the subsequent month but the effect from one month to the next would not be material. I have abandoned my thoughts of billing this profit as services rendered by Puridet. As you pointed out, this really is a sale of toll manufacturing plus there could be some VAT issue created by billing SD for services.

(Emphasis added).

48.    Smeaton responded to Gardner that same day, as follows:

I will get them to show you the records of SD, email them this month. Moving forward this exercise will be done monthly actually it wont be hard as the transactions a[re] simple.

49.    Emalfarb's interest regarding South Dragon continued as well. On September 5, 2002, he wrote Hooper an e-mail that stated,

It may be useful exercise . . . to track the following: A/R that was in the books on March 31, 2002 to see if the outstanding invoices were (i) paid to Puridet and (ii) the funds were deposited into Puridet's banking account including but not limited to Red Dragon (read: South Dragon). This will allow us to double check (a) the receivables are real (if they were collected they were real), (b) what is the length of time from invoicing to collection and (c) that the funds were deposited into Puridet's bank account.

50.    Later, on September 10, 2002, Hooper wrote to Smeaton, with a copy to Emalfarb, "It is important that we discuss South Dragon account. Please give me a call."

51.    On October 23, 2002, Hooper (apparently in Hong Kong) wrote to Emalfarb:

The South Dragon is a hot issue. They are in the process of setting up a Puridet Dong Guan Company (100% owned subsidary). Robert estimates between 60-70% of the accounts can be transferred to this company. He however thinks this has to be done gradually which I don't clearly understand. The 30-40% is difficult. I have stated we want strong walls between the two companies and I am working on legal agreements and other things to make sure of this. I will fill you in with more details on the telephone."

52.     On October 24, 2002, Hooper e-mailed Emalfarb, "Following done to date: 2. Reviewed South Dragon - plan established. Will talk via telephone before e-mailing."

53.     On November 13, 2002, Hooper wrote Smeaton as follows:

What is the status of the two new entities? The one in Dongguan and the one in Shanghai? I have completed the South Dragon contract draft and will review with mark before forwarding to you today.

54.     Smeaton replied to Hooper's e-mail: "The status of the new two entities is still in the making, however, there has been a lot of progress but not yet fully ready to roll. I think we can have the Dongguan entity finalised very quickly, the Shanghai/Hangzhou in theory I have covered all issues it is just now preparing the company." Hooper forwarded a copy of the response to Emalfarb.

55.     Hooper prepared a draft contract for the new Dongguan entity, using another manufacturing agreement as a model. A draft redlined version of the contract referred to by Hooper was, in fact, found on Emalfarb's laptop during the Moscowitz Report investigation. It purports to setup an exclusive distribution arrangement between Puridet and South Dragon. While it recites the relationship between Puridet and Puridet Dongguan (as a "wholly-owned subsidiary" of Puridet), it has no reference to South Dragon's relation to Puridet and its directors. To the contrary, it gives the appearance that it is memorializing an arms length transaction between Puridet and South Dragon.

56.     It appears that the draft contract for the new Dongguan entity was never executed based on an e-mail from Emalfarb to Smeaton that stated:

> Red Dragon (read: South Dragon), this is a situation that last I knew David and you agreed would be cleaned up and **you were going to set up a company** which can be audited and which we could all be comfortable knowing what their A/R was, what the collections were and what, if any, write offs they were going to have to take, as these in the end would fall back onus.

(Emphasis added).

57.     Emalfarb explained, in another e-mail to Smeaton on July 29, 2003, why his failure to create the structure, as they had agreed to do, was a problem. Dyadic needed to have South Dragon appear as a separate company for the purpose of dealing with external financial institutions and investors. As he stated:

> You need to have customers along with the supporting documentation that allows you to obtain traditional financing from local banks in Hong Kong and/or China and this means you have to do as you said you were going to do, which as far as I know no one had done yet, restructure the Red Dragon situation.
>
> We have to be able to have accounting standards that are acceptable to banks who we need to lend money to, potential investors who may be interested in buying Puridet (Asia) Limited and Dyadic who is charged with overseeing our investment.

58.     On August 19, 2003, Smeaton wrote to Emalfarb, in a lengthy e-mail, "The issues regarding Indonesia [P.T. Pasifik Ichsan] and South Dragon I will spell all this out in detail to show you what has been done and achieved, please remember. I am working with limited resources but all is going well."

59.     But the failure to formally "restructure" or "finalise" or build the desired "strong walls" did not prevent South Dragon from continuing to "operate" and to be held out as Puridet's largest customer until it abruptly stopped "purchasing" from Puridet in July 2004. That same month, Puridet began to "sell" to "Pui Shing Detergent Company." This "coincidence" hardly could have gone unnoticed to anyone paying attention.

60.     Pui Shing immediately became Puridet's largest account receivable, as South Dragon had been previously. South Dragon remained on the books as an account receivable, and

collections in its name were made over the next few months and years. But the South Dragon receivable was fully reserved by December 21, 2004.

61.    In Dyadic's 2005 Form 10-KSB, Pui Shing is referred to as "one of three customers in 2005 whose trade receivable balances equaled or exceeded 5% of total receivables, representing approximately 16%, 7% and 6%, respectively of total accounts receivable." Pui Shing is the 16% "customer."

62.    Both South Dragon and Pui Shing were operated from Puridet. Puridet's Tsang's computer had formats for the letterhead, logo, product label, banking information and mailing envelopes for South Dragon, and at least the letterhead, envelopes, and banking information for Pui Shing. In fact, the envelopes reflected the same address for both companies, the seventeenth floor of the building where Puridet Hong Kong is located, a space which was just abandoned office space. In addition, a loan agreement found on Tsang's computer notes that it is between "Puridet (Asia) Limited/Fushing South Dragon Detergent Company (hereinafter called 'The Company') and the borrower."

63.    South Dragon was combined with Puridet for purposes of accounting. As an example, on January 8, 2001, Tsang sent Smeaton an e-mail in which he analyzed Puridet's cash flow. One of the entries under cash on hand is labeled, "PAL/SD."

64.    Pui Shing's financial statements were also found on the computer of Henry Wong, Puridet's internal accountant, and e-mailed to Smeaton and Tsang. Its bank accounts were also considered part of Puridet's "cash position." Tsang's computer also had e-mails discussing shipments and bills of lading for sales by Pui Shing. In a lengthy e-mail chain with an unrelated Chinese company, Tsang explained, on February 16, 2006, in response to an inquiry about the name of the company: "You can create a new account for Pui Shing Detergent Co., instead of

making any change of Puridet's account in your system. Actually we will use these two companies name case by case."

65.     A number of Puridet employees confirmed the use of South Dragon and then Pui Shing as vehicles for the sale of Puridet product to local Chinese customers who did not want to pay their VAT obligation.

66.     Daniel Shook is a Dyadic technical employee who went to work for Puridet in Hong Kong and Dongguan from January 2004 through December 2005. Both Smeaton and a Puridet employee named John Zhai had told him about South Dragon, which Shook characterized as "another company selling product that was really Puridet." The purpose of the company was to enable customers to avoid the Chinese VAT obligation. Shook also saw drums labeled "South Dragon" at both Puridet in Hong Kong and in Dongguan. Shook also stated that he saw Puridet salespeople come in with "big wads" of cash to give to Yiu Man Chan, known as "Aman," the manager of the Puridet Dongguan plant.

67.     Nathan Dwyer ("Dwyer"), who was doing sales and collections for P.T. Pasifik Ichsan in Indonesia, knew that South Dragon was a "second company" that Smeaton had in China. In about 2004, Dwyer had a customer who waned to do business directly with Puridet, rather than through P.T. Pasifik Ichsan because the customer was in a duty free zone and P.T. Pasifik Ichsan was not. According to Dwyer, Smeaton told him that he would put the business through South Dragon, as it could better accommodate the customer.

68.     Michael Kent ("Kent"), who had been recruited by Emalfarb, became sales manager and liaison to Smeaton for international business development at Puridet in September 2004. At that time South Dragon had ceased to make new sales and Pui Shing was now selling product. Kent was told that Smeaton and John Zhai's father had registered South Dragon in

China. He understood that South Dragon was eliminated when Zhai's father died, and then the business was done through Pui Shing. Kent stated that *it was common knowledge at Puridet* that first South Dragon and then Pui Shing functioned to make sales to customers who did not want to pay VAT. According to Kent, the same salesmen sold to the same customers; the invoice would be from either Puridet or South Dragon/Pui Shing depending upon whether VAT was to be paid by the customer. He saw this on salesmen's commission sheets. And, Smeaton told him that VAT business went through Puridet, non-VAT business went through Pui Shing.

69.     Smeaton also stated to Kent and Dwyer that he paid off Chinese government officials in 2004 when he was fined for keeping two sets of books at Puridet, one for Puridet and one for South Dragon or Pui Shing. These payments were made after an audit of Puridt was conducted by government officials. In an April 20, 2007, e-mail to Moor, Daniel Shook referred to an allegation made some time around 2004 by John Zhai that Puridet Dongguan had two sets of books.

70.     Both Gardner and Emalfarb admitted to the Moscowitz Report investigation that South Dragon and Pui Shing were related parties to Puridet under GAAP. In addition, in a March 2, 1998 fax from Emalfarb to Smeaton during the negotiations to acquire Puridet, Emalfarb noted that "P.I. [sic] Pasifik Ichsan in Indonesia" was an entity "in the family of companies in which Puridet has an equity state." He inquired as to whether those relationships could remain unchanged in the change of ownership. Hooper's due diligence memorandum notes, regarding "Indonesia," "Company is 100% owned by local distributor. Side letter that Puridet owns unofficially 85%." Additionally, Tabloff noted in an e-mail to Emalfarb and Hooper dated August 14, 2000, encouraging them to approve new sales for P.T. Pasifik Ichsan that "Indonesia . . . is still owned by Robert [Smeaton] . . . ."

71.     Based on the allegations in ¶¶ 43–70, it is clear that Emalfarb, Gardner, and anyone associated with Puridet, knew that there were significant risks for fraud or operational irregularities at Puridet in 2000 through early 2005, yet failed to publicly disclose those risks. It is also clear that Emalfarb and Gardner knew that Dyadic's internal controls were insufficient to prevent Smeaton and Puridet from violating Generally Accepted Accounting Principles and Standards, violating operational directives, or committing fraud.

**Moor Discovers Puridet Improprieties and Does Nothing**

72.     Soon after becoming a public company, now responsible for public filings with the SEC, Dyadic represented to the public that it instituted increased financial controls to control fraud and insure accurate accounting and financial reporting. Thus, in January 2005, Dyadic formed an Audit Committee, a subcommittee of the Board of Directors, with the following duties:

> The Audit Committee will oversee our accounting and financial reporting processes and the audits of our financial statements. The Audit Committee will select our independent auditors, review our filings with the SEC, review the results and scope of audit and other services provided by our independent auditors, including auditor fees, review and evaluate our audit and control functions and investigate other areas of concern that may be manifested in our financial reports or underlying accounting controls and systems.

73.     Soon thereafter, in February 2005, Wayne Moor was hired as the CFO of Dyadic.

74.     As CFO, Moor regularly reported to the Audit Committee and made special reports specifically regarding fraud risks and internal controls regarding proper accounting at Puridet. As such, Moor was the person responsible for investigating and reporting any fraud, fraud risks, accounting improprieties, or controls on accounting and financial reporting at Puridet. Moor was also made a manger of Puridet, becoming an employee of that entity.

75.     Within just a month of being hired to fill these roles, Moor discovered signs of accounting improprieties at Puridet. For example, from a quick review of the financial reporting

from Purident, Moor knew that Puridet was able to manipulate the timing of payment of receivables from Puridet's largest customer, South Dragon and Pui Shing. Thus, on March 16, 2005, Moor wrote to Emalfarb about the South Dragon receivable, stating:

> Receivables from the stratosphere look like they may be OK. However, what has really happened in that Dyadic's aging has improved and Puridet's has become a little worse. This is primarily due to the South Dragon receivable which is now all well over 150 days. The balance at year end was about $396,000 (U.S.) and until now (two and a half months after year End) only another $39,000 or so has been collected.

76.     Moor also knew that Emalfarb either did not understand the problem or was complicit in it, since Emalfarb never responded to Moor's e-mail of March 16, 2005.

77.     Furthermore, by the end of 2006, Moor knew or recklessly disregarded the fact that Puridet controlled Pui Shing, its largest customer, and that the two were at the very least related parties under GAAP, and thus that the sales by Puridet to Pui Shing were being improperly reported. In addition, Moor knew by this time that Puridet had no internal controls over Smeaton, that significant fraud and reporting risks existed at Puridet, and that he had done nothing to control those risks or reign in Smeaton.

78.     For example, by November 2006 at the latest, Moor knew that Puridet's Tsang *had control over its largest customer's bank account.* Such an arrangement would destroy any independence between a customer and its supplier, allow the supplier to in effect control the customer, have access to its internal, and confidential financial information. Such an arrangement strongly infers that the two companies are, in fact, identical. Moor acknowledged all of this and the fact that such an arrangement was forbidden by United States accounting standards when he wrote to Tsang that "[c]ontrol over a bank account of a customer here is not something we would ever see." Tsang responded by simply ignoring the issue. As such, Moor was put on notice that not only was the accounting of sales to Puridet's largest customer

incorrect pursuant to GAAP, but that he had no control over, and no control existed over Puridet and its financial reporting or fraud risk.

79.     Moor also knew or recklessly disregarded that South Dragon, in the past, had been simply a pass through account for Puridet transactions intended to avoid VAT taxes and that Pui Shing was now a similar fraudulent book keeping entry, not a real customer.

80.     For example, as reported by former Dyadic employee Michael Kent, it was common knowledge at Puridet that South Dragon and Pui Shing were pass-through accounts used to make Puridet sales to customers who did not want to pay VAT. In addition, Smeaton freely told everyone at Puridet that he had paid off Chinese government officials in 2004 when they discovered he was keeping two sets of books at Puridet, on for Puridet and one for South Dragon and Pui Shing. Emalfarb, Gardner, and Tsang also knew these facts. Moor, as the CFO of Dyadic, a manager of Puridet, and person responsible for monitoring financial reporting, fraud risks, and accounting irregularities then either knew or recklessly disregarded these facts.

81.     Furthermore, Moor knew or recklessly disregarded that Pui Shing was being used for the same purpose that South Dragon had been in the past, in other words that Pui Shing was a fake customer just as South Dragon had been. Thus, Moor specifically asked in an email dated November 2, 2006, whether South Dragon and Pui Shing were, in fact, the same company, and received a superficial response from Tsang. Moor never even took the simple step of telephoning Pui Shing to confirm who or what it was.

82.     Besides the fact that Pui Shing and South Dragon were related parties to Puridet at the very least, and so the sales to that entity were improperly accounted for in all of Dyadic's financial statements, Moor knew that Smeaton, Tsang, and Puridet had a history and practice of irregular and improper accounting methods regarding collections in China. For example, Moor

24

sent an e-mail to, among others, Smeaton and Emalfarb on November 28, 2006, noting that the increasing Pui Shing receivable was "a real problem."

83.     The next day Smeaton sent a list and a long explanation of Puridet's collection practices, which he admitted would not pass muster under United States accounting standards, to Moor and others. He stated, in part:

> I also since early this month when Mark discussed the issue with me been on the cash chasing mode, This can be reflected in the November collections and I know that collections in December should also be good, by the end of the year we should be looking in better shape for the auditors. I have checked the outstanding as of today, all of May is paid, there is 278,000 left in June and July has outstanding 703,000. We have post dated cheques in hand of 1,189,000. (Pui Shing has passed to us post dated cheques from their customers in China, I know these are of no interest to auditors but here they are useful in our business world). It is a very common practice to pass cheques onwards, an example being "You may owe Bill and Bill owe me", so Bill passes a check he got from you to me, in many cases there are post dated cheques. (Unfortunately the attitude is take it or leave it, it is best in most cases to accept the payment from customers that you know are ok).

Moor's receipt of this e-mail proves Moor knew that Smeaton was engaging in improper collections practices; that Moor had no control over Smeaton or Puridet's financial reporting, internal controls, or fraud risk; and that Smeaton could control the collection of receivables from Pui Shing at a whim, providing yet further evidence that Pui Shing was controlled by Puridet.

84.     Based on the allegations in ¶¶ 72–83, above, it is clear that Moor, and the Audit Committee Defendants through him, knew that there were significant material risks of fraud, and material operational and accounting improprieties at Puridet between February 2005 and April 2007, yet they failed to publicly disclose those risks and improprieties. It is also clear that Moor and the Audit Committee Defendants knew that Dyadic's internal controls were insufficient to prevent Smeaton and Puridet from violating Generally Accepted Accounting Principles and Standards, violating operational directives, or committing fraud.

## 2003-2004 Whistleblower E-mails

85.     Emalfarb stated to the Moscowitz Report investigation that he was always cognizant of the "dangers of doing business in China."

86.     On December 22, 2003, Emalfarb received an anonymous e-mail. The e-mail, sent from "blackgg65@hotmail.com" and signed "Blue Devil code # 2003520," made a series of detailed and specific allegations of wrongdoing by Puridet management. Those allegations included: (1) Aman, the Puridet Dongguan factory manager, was receiving bribes from raw materials suppliers in China; (2) Aman and others were skimming raw materials to be sold on the side; (3) Smeaton owned a company in Indonesia that owed Puridet a great deal of money; (4) there was a company called South Dragon which was set up by Puridet management and whose payment of its obligations to Puridet was at risk; (5) management was manipulating many expense accounts; and (6) Smeaton and Chih owned the Hong Kong office, which allowed them to inflate the rent paid by Puridet.

87.     Emalfarb already knew most of these allegations, however. He already knew Smeaton and Chih owned the office space leased by Puridet and already knew that the company in Indonesia belonged to Smeaton.

88.     Emalfarb forwarded the e-mail of December 22, 2003, to Gardner, Dyadic's Controller, and also responded to it, asking for more information regarding the allegations against Aman. On January 9, 2004, Emalfarb received a response from the anonymous e-mailer, also signed "Blue Devil code # 2003520." This e-mail suggested methods of preventing the improprieties listed in the first e-mail. The sender stated that he would not write again until April 2004.

89.     On April 20, 2004, as promised, another anonymous e-mail was sent to Emalfarb. This e-mail again focused on the problems at the Dongguan factory, noted that Smeaton was selling Puridet products at low prices to his Indonesian company, and suggested that Emalfarb arrange to have Tsang take over the operation of Puridet. This e-mail was forwarded to Gardner and Smeaton.

90.     Emalfarb reported the whistleblower e-mails to Dyadic's auditor, Ernst & Young, in response to an audit inquiry during the 2003 audit. The restated 2003 Consolidated Financials are included in the Dyadic Registration Statement for its sale of stock (Form SB-2), filed on December 30, 2004, and in the Dyadic Prospectus, dated January 28, 2005, and filed on February 1, 2005. However, no one at Dyadic or its auditor, Ernst & Young, ever investigated the allegations contained in the whistleblower e-mails.

91.     In preparation of the 2004 audit, Cindy Chiang, the Ernst & Young Hong Kong audit manager on the Puridet audit was told that South Dragon was winding down because the owner was sick. Ms. Chiang decided that she had to determine whether to reserve for "doubtful debts." Tsang volunteered to her that he was signing checks for the company because of the owner's illness and that he functioned as a "coordinator" for the account (according to the EY Hong Kong auditors, that term has no legal or accounting definition). No one at Ernst & Young, including Ms. Chiang, ever conducted an independent investigation into these obvious improprieties.

92.     Beginning with the Dyadic audit for the year ending December 31, 2002, Puridet's financial statements were consolidated with Dyadic's. Accordingly, Puridet related party transactions would be a matter of inquiry in the Dyadic audit.

93.     Based on the allegations in ¶¶ 85–92, above, it is clear that Emalfarb and Gardner knew that there were significant risks of fraud or operational improprieties at Puridet during the Class Period, yet failed to publicly disclose those risks. It is also clear that Emalfarb and Gardner knew that Dyadic's internal controls were insufficient to prevent Smeaton and Puridet from violating Generally Accepted Accounting Principles and Standards, violating operational directives, or committing fraud.

## FALSE AND MISLEADING STATEMENTS

94.     Dyadic has already admitted that its financial statements and SEC filings during the Class Period contain materially misleading statements and omissions. (Dyadic 8-K and Press Release, Apr. 24, 2007 (admitting that Dyadic's financial statements and SEC filings "should no longer be relied upon").) Those financial statements and SEC filings include, but are not limited to, the following:

95.     On November 15, 2004, Dyadic filed a materially false and misleading report with the SEC for the quarter ended September 30, 2004, on Form 10-QSB, that reported on financial results of operations, that included its Asian subsidiary, but that failed to disclose that the Asian subsidiaries were engaged in the improprieties alleged herein. The 10-QSB was signed and certified by Emalfarb and Gardner pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

96.     On January 24, 2005, Dyadic filed a materially false and misleading amendment to a prior registration statement with the SEC explaining that, in January 2005, the Board of Directors had established an Audit Committee with the following duties:

> The Audit Committee will oversee our accounting and financial reporting processes and the audits of our financial statements. The Audit Committee will select our independent auditors, review our filings with the SEC, review the results and scope of audit and other services provided by our independent auditors, including auditor fees, review and evaluate our audit and control

functions and investigate other areas of concern that may be manifested in our
financial reports or underlying accounting controls and systems.

The statement regarding the Audit Committee is misleading because the Audit Committee failed
to disclose that it never adequately fulfilled these duties. The statement was signed by
Defendants Emalfarb, Gardner, Warner, and Berman.

97.   On April 15, 2005, Dyadic filed a materially false and misleading report with the
SEC for the year ended December 31, 2004, on Form 10-KSB. The 10-KSB was signed and
certified by Emalfarb and Moor pursuant to SOX, and signed by Defendants Warner and
Berman. The Form 10-KSB included materially misleading misstatements, including (1) the
representation that "[t]he Asian subsidiary serves as one of our primary distributors to foreign
textile, pulp and paper, chemical and enzyme businesses" without disclosing that one of the
major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes,
(2) the representation that "[a]s of December 31, 2004, the Asian subsidiary had approximately
$529,000 of cumulative profits" without explaining that those profits were, at least in part, the
result of the tax-avoidance scheme, (3) the representation that Dyadic "increase[d] . . . the
allowance for doubtful accounts of our Asian subsidiary of approximately $327,000" without
explaining that the largest "accounts" were dummy corporations set up to avoid Chinese taxes,
(4) the representation that "our Asian subsidiary generated higher net income in 2004 than it did
in 2003 due to an increase in its net sales of approximately 24%" without disclosing that a large
proportion of those net sales were to a related party, and (5) the failure to disclose that, because
Dyadic's financial statements did not properly account for its related party transactions, they
were in violation of Generally Accepted Accounting Principles ("GAAP") and therefore
"presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In
addition, the Form 10-KSB failed to disclose (1) the increased risks of fraud or other

improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

98.     On May 2, 2005, Dyadic filed a materially false and misleading proxy statement, stating that the Audit Committee would be responsible for "reviewing with our independent registered public accounting firm and management the Company's unaudited quarterly financial statements, the Company's audited annual financial statements and independent registered public accounting firm's opinion; reviewing and maintaining direct oversight of the plan, scope and results of the audit by the independent registered public accounting firm; reviewing and approving all professional services performed and related fees charged by the independent registered public accounting firm; being solely responsible for the retention or replacement of the registered independent public accounting firm; monitoring the adequacy of the Company's accounting and financial policies, internal controls, disclosure controls and procedures, reporting systems and filings with the SEC; and reviewing and updating our code of business ethics and monitoring compliance therewith." The proxy statement is materially misleading because the Audit Committee failed to disclose that it never adequately fulfilled its duties. In addition, the proxy statement failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

99.     On May 17, 2005, Dyadic filed a materially false and misleading report with the SEC for the quarter ended March 31, 2005, on Form 10-QSB. The 10-QSB was signed and certified by Emalfarb and Moor pursuant to SOX. The Form 10-QSB included materially misleading misstatements, including (1) the representation that "[t]he Asian operating segment is engaged in the manufacturing and distribution of chemical and enzyme products to the textile

and pulp and paper industries" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes and (2) the representation that the "Asian Operating Segment" had $1,343,817 in total net sales for the quarter ended March 31, 2005, without disclosing that a large proportion of those net sales were to a related party or that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the Form 10-QSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

100.    On August 15, 2005, Dyadic filed a materially false and misleading report with the SEC for the quarter ended June 30, 2005, on Form 10-QSB. The 10-QSB was signed and certified by Emalfarb and Moor pursuant to SOX. The Form 10-QSB included materially misleading misstatements, including (1) the representation that "[t]he Asian operating segment is engaged in the manufacturing and distribution of chemical and enzyme products to the textile and pulp and paper industries" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes and (2) the representation that the "Asian Operating Segment" had $1,474,577 in total net sales for the quarter ended June 30, 2005, without disclosing that a large proportion of those net sales were to a related party or that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the Form 10-QSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

101.    On November 14, 2005, Dyadic filed a materially false and misleading report with the SEC for the quarter ended September 30, 2005, on Form 10-QSB. The 10-QSB was signed and certified by Emalfarb and Moor pursuant to SOX. The Form 10-QSB included materially misleading misstatements, including (1) the representation that "[t]he Asian operating segment is engaged in the manufacturing and distribution of chemical and enzyme products to the textile and pulp and paper industries" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes and (2) the representation that the "Asian Operating Segment" had $1,705,581 in total net sales for the quarter ended September 30, 2005, without disclosing that a large proportion of those net sales were to a related party or that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the Form 10-QSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

102.    On April 28, 2006, Dyadic filed a materially false and misleading proxy statement with the SEC stating the following regarding the Audit Committee:

> The audit committee has oversight responsibility for quality and integrity of our consolidated financial statements. The committee meets privately with members of our independent registered public accounting firm, has the sole authority to retain and dismiss the independent registered public accounting firm and reviews their performance and independence from management. The independent registered public accounting firm has unrestricted access and reports directly to the committee. The audit committee met five (5) times during 2005. The primary functions of the audit committee are to oversee: (i) the audit of our consolidated financial statements provided to the SEC and our security holders and (ii) our internal financial and accounting processes. Additionally, the audit committee has responsibilities and authority necessary to comply with Rule 10A-3(b) (2), (3), (4), and (5) of the Exchange Act, concerning the responsibilities relating to: (a) registered public accounting, (b) complaints relating to accounting, internal

accounting controls or auditing matters, (c) authority to engage advisors and (d) funding.

The proxy statement is materially misleading because the Audit Committee failed to disclose that it never adequately fulfilled its duties.

103.    On March 29, 2006, Dyadic filed a materially false and misleading report with the SEC for fiscal year December 31, 2005, on Form 10-KSB. The 10-KSB was signed and certified by Emalfarb and Moor pursuant to SOX, and signed by Defendants Berman, Rosengart, and Warner. The Form 10-KSB included materially misleading misstatements, including (1) the representation that Dyadic conducted an "annual impairment review" of the Asian subsidiaries' goodwill and that "[t]he impairment reviews resulted in no goodwill impairment charge" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes and (2) the representation that the "Asian Operating Segment" had $6,185,452 in total net sales for the year ended December 31, 2005, without disclosing that a large proportion of those net sales were to a related party or that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the Form 10-KSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

104.    On May 4, 2006, Defendants issued a press release announcing that Dyadic had purchased the remaining 17.5% of shares of its Asian subsidiary, giving it 100% ownership. The press release quoted Defendant Emalfarb as making the following material misstatements:

> Mark Emalfarb, Dyadic's Chairman and CEO, commented, "Our Asian subsidiary has been an important part of Dyadic's global business for a number of years, and has ably served as our gateway to the Far East. The Asian subsidiary team, now 74 people strong, provided approximately 40% of our 2005 revenues and has

> done a particularly outstanding job in helping us to establish a toe-hold in the pulp
> & paper industry in the Far East. We are excited about future growth
> opportunities in the Asian pulp & paper industry and in other areas, such as
> energy. Asia is a growing economy which will require significant amounts of
> energy, so we see it as a key market for Dyadic." Mr. Emalfarb continued, "This
> transaction, along with the recently announced Debt-for-Equity conversion,
> significantly simplifies and streamlines our balance sheet."

These statements were materially misleading because they failed to disclose (1) that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes, (2) that the Asian subsidiary's revenues were, at least in part, the result of the tax-avoidance scheme, (3) that a large proportion of the Asian subsidiary's sales were to a related party, and (4) that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the press release failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

105.    On May 15, 2006, Dyadic filed with the SEC a materially false and misleading report for the quarter ended March 31, 2006, on Form 10-QSB. The 10-QSB was signed and certified by Emalfarb and Moor pursuant to SOX. The Form 10-QSB included materially misleading misstatements, including (1) the representation that "[t]he Asian operating segment is engaged in the manufacturing and distribution of chemical and enzyme products to the textile and pulp and paper industries" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes, (2) the representation that the "Asian Operating Segment" had $1,478,155 in total net sales for the quarter ended March 31, 2006, without disclosing that a large proportion of those net sales were to a related party or that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be

misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), (3) the representation that "the Company and its 82.5% majority owned Asian Subsidiary entered into a satisfaction and purchase agreement with the Asian Subsidiary's two minority shareholders, its managing director and one of its other key employees . . . .bringing the Company's ownership in the Asian Subsidiary to 100%" without disclosing any of the improprieties alleged herein, and (4) the representation that Dyadic had added "additional technical sales representatives in our Asian subsidiary" without disclosing the improprieties alleged herein. In addition, the Form 10-QSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

106.    On August 11, 2006, Dyadic filed with the SEC a materially false and misleading report for the quarter ended June 30, 2006, on Form 10-QSB. The 10-QSB was signed and certified by Emalfarb and Moor pursuant to SOX. The press release announcing the filing quoted Emalfarb as making the following misstatements:

> "We continue to make progress in all areas core to the Company's growth strategy—pulp & paper, cellulosic ethanol and biotherapeutic proteins," commented President and CEO of Dyadic, Mark Emalfarb. We are beginning to see results from our significant investment in the pulp & paper effort, especially in such geographic regions as Asia and South America, where we have had a sustained effort the longest. . . . ."

That statement was materially misleading because it failed to disclose (1) that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes, (2) that the Asian subsidiary's revenues were, at least in part, the result of the tax-avoidance scheme, (3) that a large proportion of the Asian subsidiary's sales were to a related party, and (4) that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the Form 10-QSB failed to disclose (1)

the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

107.     The 10-QSB filed August 11, 2006, included other materially misleading misstatements, including (1) the representation that "[t]he Asian operating segment is engaged in the manufacturing and distribution of chemical and enzyme products to the textile and pulp and paper industries" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes, (2) the representation that the "Asian Operating Segment" had $1,595,054 in total net sales for the quarter ended June 30, 2006, without disclosing that a large proportion of those net sales were to a related party, (3) the representation that, "[a]s of May 1, 2006, the Company is recording 100% of the Asian Subsidiary's operating results in the accompanying condensed consolidated statements of operations" without disclosing that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), and (4) the representation that Dyadic had added "additional technical sales representatives in our Asian subsidiary" without disclosing the improprieties alleged herein. In addition, the Form 10-QSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

108.     On November 9, 2006, Dyadic filed with the SEC a materially false and misleading report for the quarter ended September 30, 2006, on Form 10-QSB. The 10-QSB was signed and certified by Emalfarb and Moor pursuant to SOX. The 10-QSB included materially misleading misstatements, including (1) the representation that "[t]he Asian operating segment is engaged in the manufacturing and distribution of chemical and enzyme products to the textile

and pulp and paper industries" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes, (2) the representation that the "Asian Operating Segment" had $1,850,266 in total net sales for the quarter ended September 30, 2006, without disclosing that a large proportion of those net sales were to a related party, (3) the representation that, "[o]n April 28, 2006, the Company purchased the remaining 17.5% of shares held by the two minority shareholders of its Asian subsidiary, giving the Company 100% ownership of that subsidiary" without disclosing any of the improprieties alleged herein, and (4) the representation that, "[a]s of May 1, 2006, the Company is recording 100% of the Asian Subsidiary's operating results in the accompanying condensed consolidated statements of operations" without disclosing that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the Form 10-QSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

109.    On November 20, 2006, Defendants announced that Dyadic entered into definitive agreements with institutional investors for a private placement of Dyadic's stock for gross proceeds of $13,043,160. The announcement contained materially misleading statements, including the representation that Dyadic would use the net proceeds of the placement "to continue development of its C1 Host Technology for applications in the markets targeted by the Company's businesses, with the goal of strengthening the Company's product pipeline and accelerating the commercial launch of new products in pulp and paper, animal fee and other areas, and expanding R&D infrastructure as well as sales and marketing efforts" without

disclosing any of the improprieties alleged herein. In addition, the announcement failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

110.   On January 16, 2007, Dyadic filed with SEC a materially false and misleading Form S-3/A, signed by Defendants Emalfarb, Moor, Berman, Rosengart, and Warner, attaching as Exhibit 4.3 a securities purchase agreement between Dyadic and Abengoa Bioenergy R&D, Inc., containing the following misleading statements:

> (x)Internal Accounting Controls. The Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.
>
> . . . .
>
> (z)Foreign Corrupt Practices. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or other Person acting on behalf of the Company or any of its Subsidiaries has, in the course of its actions for, or on behalf of, the Company (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.
>
> . . . .
>
> (ff)Tax Status. The Company and each of its Subsidiaries (i) has made or filed all foreign, federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and (iii) has set aside on its books provision reasonably

adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

These statements were misleading because they failed to disclose that (1) because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), (2) that Puridet executives had "pa[id] off officials" in China to resolve accounting irregularities, (3) that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes. The filing is also misleading because it failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

111.    On April 2, 2007, Dyadic filed with the SEC a materially false and misleading report for fiscal year ended December 31, 2006, on Form 10-KSB. The 10-KSB was signed and certified by Emalfarb and Moor pursuant to SOX, and signed by Berman, Rosengart, and Warner. The Form 10-KSB included materially misleading statements, including (1) the representation that "[t]he Asian operating segment is engaged in the manufacturing and distribution of chemical and enzyme products to the textile and pulp and paper industries" without disclosing that one of the major customers of the Asian subsidiary was a dummy corporation set up to avoid Chinese taxes, (2) the representation that, "[o]n April 28, 2006, the Company purchased the remaining 17.5% of shares held by the two minority shareholders of its Asian subsidiary, giving the Company 100% ownership of that subsidiary" without disclosing any of the improprieties alleged herein, (3) the representation that the "Asian Operating Segment" had $6,446,080 in total net sales for the year ended December 31, 2006, without disclosing that a large proportion of those net sales were to a related party, and (4) the

representation that, "[a]s of May 1, 2006, the Company is recording 100% of the Asian Subsidiary's operating results in the accompanying condensed consolidated statements of operations" without disclosing that, because Dyadic's financial statements did not properly account for its related party transactions, they were in violation of GAAP and therefore "presumed to be misleading" under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). In addition, the Form 10-KSB failed to disclose (1) the increased risks of fraud or other improprieties resulting from doing business in China or (2) the lack of controls in place to prevent such fraud or other improprieties.

112.    As a result of these material misstatements and omissions, Lead Plaintiff and the Class purchased shares of Dyadic at artificially inflated prices and were thereby damaged.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

113.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or acquired Dyadic securities during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Dyadic at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

114.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dyadic's securities were actively traded on the AMEX. Although the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Dyadic or its transfer agent

and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

115.    Lead Plaintiff's claims are typical of the claims of the members of the Class because all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.

116.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are contrary to or in conflict with those of the Class members that Lead Plaintiff seeks to represent.

117.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are the following:

    i.      whether Defendants' actions as alleged herein violated the federal securities laws;

    ii.      whether documents, press releases, public filings, and public statements made by Defendants during the Class Period concerning Dyadic's financial and operating results and its Asian subsidiary, contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances, not misleading;

    iii.      whether the Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents, press releases, public filings, and public statements;

    iv.      whether the market price of Dyadic during the Class Period was artificially inflated due to the material misstatements or omissions complained of herein; and

    v.      whether the Class members have sustained damages, and, if so, the appropriate measure thereof.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

### Presumption of Reliance: Fraud-On-The-Market Doctrine

119.    At all relevant times, the market for Dyadic securities was an efficient market for the following reasons, among others.

(a)     Dyadic's securities were listed and actively traded on the AMEX, a highly efficient and automated market;

(b)     During and around the Class Period, on average, hundreds of thousands of shares of Dyadic stock were traded on a weekly basis, demonstrating a very active and broad market for Dyadic stock and permitting a strong presumption of an efficient market;

(c)     As a regulated issuer, Dyadic filed periodic public reports with the SEC and the AMEX;

(d)     Dyadic regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Dyadic was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly-available and

entered the public marketplace;

(f)    Numerous NASD member firms were active market-makers in Dyadic stock at all times during the Class Period; and

(g)    Unexpected material news about Dyadic was reflected and incorporated into the Company's stock price during the Class Period.

120.   As a result of the foregoing, the market for Dyadic securities promptly digested current information regarding Dyadic from all publicly-available sources and reflected such information in Dyadic's stock price. Under these circumstances, all purchasers of Dyadic securities during the Class Period suffered similar injury through their purchase at artificially inflated prices, and a presumption of reliance applies.

<strong><u>No Safe Harbor</u></strong>

121.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized or approved by an executive officer of Dyadic who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

122.     Lead Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

123.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period did (a) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein, and (b) cause Lead Plaintiff and the other members of the Class to purchase Dyadic securities at artificially inflated prices. In furtherance of the unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

124.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of Dyadic securities in an effort to maintain artificially high market prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

125.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Dyadic's financial well-being, business relationships, and prospects, as specified herein.

126.     Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Dyadic's value, performance, and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Dyadic and its business operations and future prospects not misleading in light of the circumstances under which they were made, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit on the purchasers of Dyadic securities during the Class Period.

127.    The Officer Defendants' primary liability arises from the following facts: (a) during the Class Period, they were high-level executives and/or directors at Dyadic and/or Puridet and were members of Dyadic's and/or Puridet's management team or had control thereof; (b) the Officer Defendants, by virtue of their responsibilities and activities as senior officers and/or directors of the Company were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and reports; (c) the Officer Defendants enjoyed significant personal contact and had access to other members of the Company's management team, internal reports, and other data and information about Dyadic's finances, operations, and sales at all relevant times; and (d) the Officer Defendants were aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

128.    The Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. The Officer Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose of concealing Dyadic's financial well-being, business

relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Officer Defendants' omissions and misstatements regarding financial operations at its Asian subsidiaries throughout the Class Period, the Officer Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

129.    The Audit Committee Defendants' primary liability arises from the following facts: (a) during the Class Period, they were charged with monitoring the adequacy of Dyadic's accounting and financial policies, internal controls, disclosure controls and procedures, reporting systems and filings with the SEC; (b) the Audit Committee Defendants enjoyed significant personal contact and had access to members of the Company's management team, internal reports, and other data and information about Dyadic's finances, operations, and sales at all relevant times; and (c) the Audit Committee Defendants were aware of Dyadic's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

130.    The Audit Committee Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. The Audit Committee Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose of concealing Dyadic's involvement in the financial improprieties at its Asian subsidiaries and its inability to control those subsidiaries, which supported the artificially inflated price of its securities. As demonstrated by Dyadic's omissions and misstatements regarding financial operations at its

Asian subsidiaries throughout the Class Period, the Audit Committee Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

131.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth herein, the market price of Dyadic securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Dyadic securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, or in the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Dyadic securities at artificially inflated prices and were damaged thereby.

132.    At the time of the misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Dyadic's financial condition and prospects, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Dyadic securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

133.    Based on the allegations contained herein, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff

and the other members of the Class suffered damages in connection with their purchases and sales of Dyadic securities during the Class Period.

135.   This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Officer Defendants and Audit Committee Defendants

136.   Lead Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

137.   The Officer Defendants and Audit Committee Defendants (collectively, the "Individual Defendants") acted as controlling persons of Dyadic within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, ownership and contractual rights, participation in or awareness of the Company's operations, and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control the general affairs of Dyadic as well as the power to control the specific corporate policies that resulted in Dyadic's primary violations, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after those statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

138.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power

to control or influence the particular transactions giving rise to the securities violations as alleged herein.

139.     As set forth above, Dyadic violated Section 10(b) and Rule 10b-5 by the acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Dyadic's wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

140.     In addition, Defendant Moor is liable as a control person for the primary violations committed by Gardner. From January 2005 through July 2006, Gardner, in his capacity as Controller, reported directly to Moor, the CFO. Moor had direct control over Gardner during that period and is therefore liable for his continuing primary violation of not disclosing the material adverse information in his possession regarding misleading statements and omissions in Dyadic's public statements.

141.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)     A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     An award of compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     An award to Lead Plaintiff and the Class of their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

142.    Lead Plaintiff demands a trial by jury on all issues so triable.

By: /s/ Adam M. Moskowitz
Adam M. Moskowitz, Esq. FL. Bar No. 984280
Kurt Zaner, FL Bar No. 0034090
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon Boulevard, 9th Floor
Miami, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

Matthew T. Heffner, Esq.
Glenn L. Hara, Esq.
SUSMAN HEFFNER & HURST, LLP
Two First National Plaza, Suite 600
Chicago, Illinois 60603
Tel: (312) 346-3466
Fax: (312) 346-2829

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true copy of the foregoing has been filed with the Clerk of the Court using CM/ECF and served via transmission of Notices of Electronic generated by CM/ECF this 22nd day of December 2008.


By: /s/ Adam M. Moskowitz
Adam M. Moskowitz