UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80948-CIV-DIMITROULEAS

MICHAEL MILLER, individually and on
behalf of all others similarly situated,                Magistrate Judge Snow

       Plaintiffs,

vs.

DYADIC INTERNATIONAL, INC.,
MARK A. EMALFARB, STEVEN J.
WARNER, HARRY Z. ROSENGART,
RICHARD J. BERMAN, ROBERT B.
SHAPIRO, GLENN E. NEDWIN,
WAYNE MOOR, and RUFUS GARDNER

       Defendants.
_____/

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO QUASH

THIS CAUSE is before the Court upon the Defendant Stephen J. Warner's Motion to

Dismiss the Second Amended Consolidated Class Action Complaint for Failure to State a Claim

Pursuant to Fed. R. Civ. P. 12(b)(6) [DE 164], filed January 21, 2009, Defendant Rufus

Gardner's Motion to Dismiss the Second Amended Consolidated Class Action Complaint for

Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) [DE 167], filed January 21, 2009,

and Defendants Wayne Moor's, Harry Rosengart's, and Richard Berman's Motion to Dismiss the

Second Amended Consolidated Class Action Complaint [DE 175], filed January 28, 2009.  The

Court has carefully considered the Motions, Lead Plaintiff Capital Max, Inc.'s Response to

Motions to Dismiss the Second Amended Consolidated Class Action Complaint [DE 181], the

1

Defendants' Replies [DE 186, 187, 188, 189, 196], the arguments made by the parties before the Court at the hearing on March 26, 2009, and is otherwise fully advised in the premises.

## I. BACKGROUND

Lead Plaintiff Capital Max, Inc. ("Capital Max") brings an action on behalf of all persons who purchased or acquired Dyadic International, Inc. ("Dyadic") securities during the Class Period between October 29, 2004 and April 23, 2007.  Capital Max alleges that the Defendants failed to disclose in statements to the Securities and Exchange Commission (SEC) and to the investing public actual occurrences of, and risks of, financial and operational improprieties by Dyadic's Asian subsidiaries during the Class Period.

On June 27, 2008, Capital Max filed its Amended Consolidated Class Action Complaint ("First Amended Complaint").  All of the served Defendants filed Motions to Dismiss.[1]  This Court dismissed this action as to Defendants Wayne Moor, Harry Rosengart, Stephen J. Warner, and Richard J. Berman, as we found that the allegations of the First Amended Complaint did not meet the heightened pleading standards required in this action. [DE 143].  On December 22, 2008, Capital Max filed its Second Amended Consolidated Class Action Complaint ("Second Amended Complaint"), in which it added several allegations to the First Amended Complaint. [DE 150].  We accept as true the allegations of the Second Amended Complaint for the purposes of these Motions.

Dyadic is a biotech company, founded in 1979 by Defendant Mark Emalfarb, that went

---

[1]  Rufus Gardner was not properly served until after this Court ruled on that round of Motions to Dismiss.

public in October 2004.  It primarily sells enzymes used in the textile industry.  Dyadic was the sole owner of its Asian subsidiary, Puridet Limited ("Puridet"), which was based in Hong Kong and owns a People's Republic of China ("China") corporation, Dongguan Puridet Softener Company Limited ("Puridet Dongguan").   Defendant Mark A. Emalfarb was the president, CEO, and chairman of the board of directors for Dyadic during the Class Period, and also a director of Puridet.  Defendant Rufus Gardner was a Controller at Dyadic from 2001 to July 2006.  Defendant Richard J. Berman was lead director of the Board of Directors and also served on the Audit Committee from January 2005 through the end of the Class Period.  Defendant Wayne Moor served as CFO and Vice President of Dyadic from January 31, 2005, through the end of the Class Period, and also served as a manager of Puridet during the Class Period.  Defendant Harry Z. Rosengart was both a director and Audit Committee member from April 2005 through the end of the Class Period.  Defendant Stephen J. Warner was a director throughout the Class Period, and a member of the Audit Committee from January 2005 through the end of the Class Period.

Capital Max alleges a scheme involving the management of Dyadic's Asian subsidiaries and two dummy corporations, South Dragon Detergent Company ("South Dragon") and Pui Shing Detergent Company ("Pui Shing"),  designed to help customers in China avoid the Chinese value-added tax (VAT).  In 1998, Dyadic acquired Puridet, whose partners included Robert Smeaton, Raymond Tsang, and Raymond Chih.  Mr. Emalfarb and Dyadic COO David Hooper were aware at the time that Puridet engaged in "off the books" transactions and unofficial ownership of 85% of an Indonesian company, P.T. Pasifik Ichsan.  Mr. Hooper informed Arthur Andersen Hong Kong and Dyadic's Hong Kong counsel that he was aware of Puridet's unrecorded sales and the potential tax liability, and instructed them not to conduct due diligence

since he would do it himself.  Mr. Gardner traveled to Hong Kong in October 2001 with Mr.

Hooper, where he was briefed about Puridet and South Dragon Detergent Company, or Fushing

South Dragon Detergent Company ("South Dragon").  Mr. Gardner's notes from this time

include the following:

> South Dragon-Robert set up for them to import raw material to avoid VAT and
> have Puridet manufacture for them.  Puridet charges 95% sale price, SD [South
> Dragon] charges their customers 100% with no VAT.  They cannot do export
> sales.  However, a Chinese customer may request a VAT invoice so that they can
> sell with VAT and be clean with the government.  We honor that request and
> therefore we give up 6% or whatever the rate is for those sales.  We bill SD for
> 95% and SD bills this customer 94% sales with 6% tax; hence SD loses money
> here as they pay the VAT to government.
>
> To continue with South Dragon and Puridet's business arrangements: I was told
> that South Dragon has been in existence since the 1st qtr. of 2000, established to
> shoulder VAT and other China government requirements so that Puridet would be
> a clean importer of raw materials and exporter of finished products.

(Second Amended Complaint, ¶40).  After the purchase of Puridet, Mr. Emalfarb, Mr. Gardner,

and Mr. Hooper communicated with each other and Mr. Smeaton of Puridet for several years

regarding Puridet, the creation of South Dragon, and formalizing its structure.  In 2000, Puridet

began making most of its local sales in China to South Dragon.  South Dragon would sell Puridet

products to Chinese locals wishing to avoid the VAT.  South Dragon was a dummy corporation

created so that cash sales and sales avoiding the VAT would not appear on Puridet's records.

Mr. Hooper and Puridet officers were also engaged in creating a Puridet Dongguan company, in

order to further shield Dyadic from the VAT-avoiding scheme and to show acceptable accounting

standards to potential lenders.  The purpose was to shield Puridet from the tax liability of the

unrecorded sales by using South Dragon.  At some point, Mr. Moor became a manager of

Puridet.  Excerpts from some of the Defendants alleged communications are below:

4

- October 20, 1998 (from Mr. Emalfarb to Mr. Smeaton): "We spoke last night and over the telephone you attempted to disclose to me your ways of doing business in China and your practices in handling various business activities in China in relation to customs matter, import and export of goods, etc. . . . Due to the immediate need to continue ongoing business operations, until further notice you and Raymond Chih are hereby authorized to continue such customary practices in doing business in the best interests of the Company." (Second Amended Complaint, ¶ 35).

- May 17, 1999 (from Mr. Tsang, copied to Mr. Emalfarb): "China Administration Fee. Starting from March 1999, a local company begin to handle the local delivery to our Local China customers either local registered company or HK company with plant in Mainland China. . . . The purpose of using, this tool is to build up a safety wall between Taxation Dept./Custom Dept., and our Factory. The other objective of this middle man is they can handle some special rebate and discount to customers and attend entertainment with custom people in some occasions. They can act much more flexible than we can. They also are our tools of collecting payment in China – local to local policy." (Second Amended Complaint, ¶ 36).

- November 8, 2001 (from Mr. Emalfarb to Mr. Smeaton): "we both need to have tight financial and other controls on Puridet (Asia) Limited's business (including but not limited to . . . documentation of the business arrangements between Puridet (Asia) Limited and . . . South Dragon . . . ." (Second Amended Complaint, ¶ 43).

- November 11, 2001 (from Mr. Smeaton to Mr. Gardner): "I think I will keep Henry [Wong, a Puridet accountant] and put him in charge of keeping the South Dragon accounts updated, particularly the accounts receivable info that the salesman are complaining is not fast enough updated, and a more clearer stock tracking system." (Second Amended Complaint, ¶44).

- November 27, 2001 (from Mr. Smeaton to Mr. Gardner): "We have a very accurate set of accounts with south Dragon (they have been checked four times).  South Dragon owes Puridet $HK 600,000 in toll manufacturing fees as at the end of the October, how do you want to deal with this?" (Second Amended Complaint, ¶46).

- November 29, 2001 (from Mr. Gardner to Mr. Smeaton): "I would still like to see these [South Dragon] statements each month if that could be arranged. . . . I believe we should consider a reduction in the 5% difference between South Dragon's invoicing to the customer and the Puridet invoice amount to SD.  This would minimize the SD profit and cause Puridet sales to reflect amounts closer to actual. . .  I have abandoned my thoughts of billing this profit as services rendered by Puridet.  As you pointed out, this really is a sale of toll manufacturing plus there could be some VAT issue created by billing SD for services." (Second Amended Complaint, ¶47).

- November 29, 2001 (from Mr. Smeaton to Mr. Gardner): "I will get them to show you the records of SD . . ." (Second Amended Complaint, ¶48).

- September 5, 2002 (from Mr. Emalfarb to Mr. Hooper): "It may be useful exercise . . . to track the following: A/R [accounts receivable] that was in the books on March 31, 2002 to see if the outstanding invoices were (I) paid to Puridet and (ii) the funds were deposited into Puridet's banking account including but not limited to [South Dragon]. This will allow us to double check (a) the receivables are real (if they were collected they are real), (b) what is the length of time from invoicing to collection . . . ." (Second Amended Complaint, ¶ 49).

- Undated in Complaint (from Mr. Emalfarb to Mr. Smeaton, regarding South Dragon): "this is a situation that last I knew David and you agreed would be cleaned up and you were going to set up a company which can be audited and which we could all be comfortable knowing what their A/R was, what the collections were and what, if any, write offs they were going to have to take, as these in the end would fall back onus [*sic*]." (Second Amended Complaint, ¶ 56).

- July 29, 2003 (from Mr. Emalfarb to Mr. Smeaton): "You need to have customers along with the supporting documentation that allows you to obtain traditional financing from local banks in Hong Kong and/or China and this means you have to do as you said you were going to do, which as far as I know no one had done yet, restructure the [South] Dragon situation. We have to be able to have accounting standards that are acceptable to banks who we need to lend money to, potential investors who may be interested in buying Puridet (Asia) Limited and Dyadic who is charged with overseeing our investment." (Second Amended Complaint, ¶ 57).

- March 16, 2005 (from Mr. Moor to Mr. Emalfarb): ". . . Dyadic's aging has improved and Puridet's has become a little worse. This is primarily due to the South Dragon receivable which is now all well over 150 days. The balance at year end was about $396,000 (U.S.) and until now . . . only another $39,000 or so has been collected." (Second Amended Complaint, ¶ 75).

- November, 2006 (from Mr. Moor to Mr. Tsang): [Mr. Moor, apparently aware of Mr. Tsang's control over Pui Shing's bank account, writes] "[c]ontrol over a bank account of customer here is not something we would ever see." (Second Amended Complaint, ¶78).

- November 28, 2006 (from Mr. Moor to Mr. Emalfarb, Mr. Smeaton, and others) e-mail stating that the Pui Shing receivable was "a real problem." (Second Amended Complaint, ¶ 82).

- November 29, 2006 (from Mr. Smeaton to Mr. Moor, copied to Mr. Emalfarb) email explaining the high Pui Shing receivable by stating: "We have post dated cheques in hand

of 1,189,000. (. . . here they are useful in our business world).  It is a very common practice to pass cheques onwards . . ." (Second Amended Complaint, ¶ 83).

South Dragon activity continued through July 2004.  Mr. Gardner received monthly financial reports on Puridet by an accountant who pointed out and analyzed the significance of the South Dragon receivable.  Mr. Gardner routinely made notebooks with financial information for Mr. Emalfarb.  Mr. Emalfarb's laptop computer contained a redlined version of a contract to set up an exclusive distribution arrangement between South Dragon and Puridet Dongguan without indicating that they were related parties; the contract was never executed.

South Dragon abruptly stopped purchasing from Puridet in July 2004, the same time at which Pui Shing Detergent Company ("Pui Shing") began purchasing from Puridet and soon became Puridet's largest account receivable.  Pui Shing was another dummy corporation, created and controlled by Puridet officers to take the place of South Dragon in the scheme when the person who registered South Dragon in China passed away.  To the common knowledge of Puridet employees, Puridet operated both South Dragon and Pui Shing.

Chinese government officials discovered that Mr. Smeaton was keeping two sets of books at Puridet (one for Puridet, another for Puridet, South Dragon, and Pui Shing).  Mr. Smeaton bribed them, apparently so that they would ignore the accounting irregularities, and freely told those at Puridet about it.  Mr. Gardner and Mr. Emalfarb knew of the VAT-avoidance scheme, South Dragon and Pui Shing's roles, and the bribery.  Plaintiffs allege that Mr. Moor, as Dyadic CFO and a Puridet manager, either knew or recklessly disregarded this.

Plaintiff alleges that several whistleblower e-mails were sent to directors of Dyadic, putting them on notice of improprieties at Puridet.  The Second Amended Complaint notes an

anonymous e-mail sent to Mr. Emalfarb in December, 2003, making a series of allegations of improprieties by Puridet management including: bribery and skimming materials by a Puridet Dongguan manager; Mr. Smeaton's ownership of an Indonesian company that owed Puridet a great deal of money; inflation of rent of Puridet's Hong Kong office owned by Mr. Smeaton and Mr. Chih; South Dragon's obligations to Puridet that were at risk; and manipulation of expense accounts. Mr. Emalfarb already knew about most of the allegations, but forwarded the e-mail to Mr. Gardner asking for more information about the bribery and skimming. Another e-mail in 2004 from the same anonymous whistleblower informed Mr. Emalfarb that Mr. Smeaton was selling Puridet products at low prices to his Indonesian company. The allegations in these e-mails were not investigated.

Dyadic hired Defendant Wayne Moor as CFO in February 2005. From the time of his hire through the end of the Class Period, Mr. Moor regularly made special reports to the Audit Committee "regarding fraud risks and internal controls at Puridet," and was responsible for doing so. (Second Amended Complaint ¶ 74). Immediately upon hire, Mr. Moor sought information regarding the South Dragon and Pui Shing receivables. He never received a response from Mr. Emalfarb to his March 16, 2005 e-mail regarding his concern about the high South Dragon receivable. Mr. Moor also knew that Puridet was able to manipulate the timing of payment from South Dragon and Pui Shing. In November 2006, Mr. Moor inquired as to whether South Dragon and Pui Shing were the same company. He also noted the problem of rising Pui Shing receivables, and received an explanation from a Puridet officer that Puridet had post-dated checks passed from Pui Shing customers on to Puridet. Mr. Moor was informed that this was a common practice in China. Mr. Moor also became aware by November 2006 that Puridet's

8

Raymond Tsang controlled Pui Shing's bank account, and remarked to Mr. Tsang in an e-mail that "[c]ontrol over a bank account of a customer here is not something we would ever see." (Second Amended Complaint, ¶78). Mr. Moor received no response from Mr. Tsang on that issue.

Following the death of Mr. Smeaton in 2007, Dyadic received more whistleblower e-mails alleging many improprieties. The Audit Committee recommended an internal investigation, which led the Board to hire Moscowitz & Moscowitz to conduct the investigation. Mr. Emalfarb, at the request of the Board, took a paid leave of absence from all Dyadic positions pending completion of the investigation. Mr. Gardner and Mr. Emalfarb admitted to the Moscowitz & Moscowitz investigators that South Dragon and Pui Shing were related parties. On April 24, 2007, Dyadic issued a press release announcing the investigation, Mr. Emalfarb's leave of absence, that Dyadic's financial statements could no longer be relied upon, and that Dyadic would voluntarily suspend trading of its stock. Moscowitz & Moscowitz submitted its report ("Moscowitz Report") to the Audit Committee on August 15, 2007. On September 24, 2007, Dyadic announced that the internal investigation revealed that "Mr. Emalfarb had willfully concealed facts relating to material operational and financial improprieties at the Company's Asian subsidiaries," and that Dyadic terminated Mr. Emalfarb as CEO and President. (Second Amended Complaint, ¶ 25).

Throughout the Class Period, Dyadic made several financial statements and filings with the SEC. Dyadic also issued press releases and announcements during this time. Plaintiffs allege that various statements, filings, press releases, and announcements were materially false, misleading, and contained material omissions. Plaintiffs alleged that Defendants deceived and

defrauded the public in an effort to maintain artificially high stock value, to the detriment of the investors in the Plaintiff Class.  The Amended Complaint refers to Mr. Emalfarb, Mr. Gardner, and Mr. Moor as the "Officer Defendants", and accuses them of knowing or recklessly disregarding information that would make Dyadic's financial statements materially false or misleading, or that the information should have prompted inquiry as to whether the financial statements were false or misleading.  Plaintiffs group Mr. Berman, Mr. Rosengart, and Mr. Warner as the "Audit Committee Defendants", and make similar allegations against them. Plaintiffs assert that the Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  Plaintiffs allege that the Officer Defendants and Audit Committee Defendants were controlling persons and therefore have liability for the misstatements under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).  Mr. Warner, Mr. Gardner, Mr. Moor, Mr. Rosengart, and Mr. Berman have filed Motions to Dismiss [DE 164, 167, 175].

## II. DISCUSSION

### A. Motion to Dismiss Standard under the PSLRA

Typically, the pleading standard for a civil action is "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  When a defendant challenges a complaint under Rule 12(b)(6) as failing to state a claim upon which relief should be granted, the court need only find that the plaintiff alleged "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (abrogating Conley v. Gibson, 355 U.S. 41 (1957)).  A claim of fraud has a heightened pleading

standard under Rule 9(b).  "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007) (quotations omitted).  However, the pleading standard for an action under Section 10(b) of the Securities Exchange Act is now governed by the Section 21D(b) of the PSLRA, 15 U.S.C. § 78u-4(b), which has heightened the pleading standards above that of Rule 9(b) by changing the particularity requirements, and changing the standard to plead scienter.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).  The PSLRA states that in securities fraud actions, the plaintiff must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  In addition, when a particular state of mind is required, the "complaint shall, with respect to each or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  § 78u-4(b)(2).  A court should rule on a motion to dismiss such a complaint based on the requirements above. § 78u-4(b)(3).  Recently, the Supreme Court in Tellabs established prescriptions for this heightened pleading standard requiring a "strong inference" for scienter.  Tellabs, 551 U.S. at 321-322.

11

The first of the three prescriptions is that courts must "accept all factual allegations in the complaint as true." Id. at 322. Secondly, "courts must consider the complaint in its entirety," including "documents incorporated into the complaint by reference." Id. In doing so, the court must consider all of the facts alleged collectively to determine if they "give rise to a strong inference of scienter." Id. at 323. Finally, courts must compare competing inferences, including "nonculpable explanations for the defendant's conduct," and determine "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324. Therefore, a claim for a violation of Section 10(b) of the Securities Exchange Act may only survive if the alleged facts, taken as a whole with incorporated documents, give rise to an inference that is at least as strong as any other inference that one may draw. Id.

### B. Section 10(b) of the Securities Exchange Act, and Rule 10b-5

Section 10(b) of the Securities Exchange Act makes it unlawful for one

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Under this provision, the SEC promulgated Rule 10b-5, which states that,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The SEC presumes that financial statements that violate generally accepted accounting principles (GAAP) are misleading or inaccurate.  17 C.F.R. § 240.4-01(a)(1).

Although the PSLRA heightened the standard to plead scienter, "it did not change any *substantive* requirements."  Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008). The Eleventh Circuit has established that Section 10(b) and Rule 10b-5 require a "showing of either an intent to deceive, manipulate, or defraud, or severe recklessness."  Id. (quotations omitted).  A person makes an omission or misrepresentation with severe recklessness if it is "highly unreasonable" and "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).  Therefore, a complaint must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." Mizzaro, 544 F.3d at 1238 (quotations omitted).

Allegations that defendants held high-level positions and thus had access to financial records at the relevant times are, by themselves, insufficient to meet the scienter requirements.  In re Smith Gardner, Sec. Litig., 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002); In re Republic Services, Inc. Sec. Litig., 134 F. Supp. 2d 1355, 1360 (S.D. Fla. 2001).  Similarly, membership on a company's audit committee similarly does not, by itself, create a strong inference of

scienter.  <u>Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.</u>, 560 F. Supp. 2d 1221,

1241 (M.D. Fla. 2008); <u>In re Sunbeam Sec. Litig.</u>, 89 F. Supp. 2d 1326, 1341 (S.D. Fla. 1999).

### 1. *Defendant Rufus Gardner's Motion to Dismiss*

Mr. Gardner makes these arguments in his Motion to Dismiss: the Second Amended

Complaint does not allege with sufficient particularity that Gardner made false or misleading

statements; Plaintiffs did not adequately allege loss causation; of the two statements signed by

Mr. Gardner, the November 15, 2004 statement did not deal with Dyadic's Asian subsidiaries

and therefore could not be false or misleading in that regard; Plaintiffs failed to plead with

particularity how the other statement, of January 24, 2005, was false or misleading; having failed

for the above reasons to state a claim against Mr. Gardner number Section 10(b), Plaintiffs

cannot state a claim under Section 20(a).

### a. *Plaintiffs Fail to Allege a False or Misleading Statement in the November 15, 2004, Form 10-QSB and in the January 24, 2005 Amendment*

In Paragraph 95 of the Second Amended Complaint, Plaintiffs allege that Dyadic's Form

10-QSB report included financial results of operations that included Dyadic's Asian subsidiaries,

but failed to disclose that the subsidiaries were engaged in improprieties.  Mr. Gardner argues,

and Plaintiffs admit, that the November 15, 2004 Form 10-QSB does not actually discuss

financial results of its Asian operations. [DE 174].  Similarly, Plaintiffs admit that the allegation

in Paragraph 96 of the Second Amended Complaint (that the statement "Audit Committee failed

to disclose that it never adequately fulfilled these duties" is misleading) is not sufficiently

particularized.  Plaintiffs argue that other parts of the Second Amended Complaint make clear

how the statement was misleading.  However, Plaintiffs have not specified with particularity in

the Second Amended Complaint why the January 24, 2005 statement is misleading, and cannot rewrite their Second Amended Complaint in its Response.  We therefore find that Plaintiffs' allegations regarding the November 15, 2004 and January 24, 2005 statements are insufficient to state a claim against Mr. Gardner (or any other Defendant).  Therefore, if the Second Amended Complaint adequately states a claim against Mr. Gardner, it must be through Dyadic's other statements Plaintiffs have alleged.

*b.  Dyadic's Statements During Mr. Gardner's Tenure as Controller Are Attributable to Him*

Plaintiffs argue that even if the two Dyadic statements signed by Mr. Gardner and specifically attributed to him in the Second Amended Complaint are not considered, Dyadic's other statements are attributable to him under the group pleading doctrine.  Mr. Gardner contends that only the statements Dyadic issued while he was controller are at issue, and that the Second Amended Complaint does not sufficiently allege that Mr. Gardner was an officer or director of Dyadic or involved in the day-to-day operations.  Mr. Gardner also questions the viability of the group pleading doctrine after the PSLRA.

The group pleading doctrine allows plaintiffs to impute the statements of group-published documents (such as SEC filings and press releases at issue here) to individuals involved in the day-to-day affairs of the corporation.  In re Sunbeam Secs. Litig., 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999).  The Eleventh Circuit has thus far declined to rule on whether the group pleading doctrine is still viable after the PSLRA came into effect.  Phillips v. Scientific-Atlanta, Inc. 374 F.3d 1015, 1018-19 (11th Cir. 2004).  However, this Court has previously ruled that, until the Eleventh Circuit rules otherwise, the group pleading doctrine is still viable with regards to Rule 9(b)'s particularity requirements, but it does not apply to PSLRA's scienter requirement.

In re Pegasus Wireless Corp. Secs. Litig., 2009 U.S. Dist. LEXIS 86380 *12-13 (S.D. Fla. Sept. 21, 2009) (citing Holmes v. Baker, 166 F. Supp. 2d 1362, 1373 (S.D. Fla. 2001)); In re Sunbeam, 89 F. Supp. 2d at 1341.

Mr. Gardner argues that Plaintiffs' allegations that he was an officer or director amount to mere labels and conclusions.  However, Paragraph 127 of the Second Amended Complaint alleges that the Officer Defendants, including Mr. Gardner, were "high-level executives" that "were members of Dyadic's and/or Puridet's management team or had control thereof" and "were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, and reports".  (Second Amended Complaint, ¶127).  This sufficiently alleges that Mr. Gardner was involved in day-to-day operations of Dyadic.  Plaintiffs have thus sufficiently alleged that Mr. Gardner was officer or director of Dyadic to whom the group pleading doctrine would apply.  Of course, only the statements that Dyadic made while Mr. Gardner was the Controller (from 2001 through July 2006) would apply.

c.  *Plaintiffs Have Adequately Pleaded Loss Causation*

Finally, Plaintiffs have adequately alleged loss causation.  Plaintiffs must plead the "traditional elements of causation and loss" in a Section 10(b) action.  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005).  If plaintiffs allege purchasing stock at an artificially inflated purchase price, they must give the defendants "notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation".  Id. at 347.  Here, Plaintiffs have specifically alleged that prior to the revelation of the improprieties, Dyadic shares traded at $5.30, but closed at $0.50 when trading resumed on January 17, 2008.  Mr. Gardner argues that the period between the last statement he signed, or between the end of

16

his tenure as controller, and the revelation of improprieties indicates that there could have been other intervening causes that raised the share price when Plaintiffs purchased them and dropped the share price after trading resumed in 2008.  As the Supreme Court has stated, the "longer the time the purchase and sale, the more likely" that other factors such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" would cause the loss.  Id. at 343.  However, we find that the nine-month period between the end of Mr. Gardner's term as controller and the revelation of improprieties is not a large enough time for us to find that Plaintiffs have inadequately pleaded loss causation.

## 2.  Defendant Wayne Moor

When ruling on Mr. Moor's Motion to Dismiss the (First) Amended Complaint, we found that Plaintiffs had failed to make allegations giving rise to a strong inference that Mr. Moor was highly unreasonable or exhibited an extreme departure from the standards of ordinary care. [DE 143].  Plaintiffs submitted their Second Amended Complaint with several additional allegations against Mr. Moor.

Among these allegations, the most important are the following:  Mr. Moor knew that Puridet was "able to manipulate the timing of payment of receivables" from Pui Shing (Second Amended Complaint, ¶75);  Mr. Moor knew or recklessly disregarded that Puridet and Pui Shing were related parties and that Pui Shing served as a dummy corporation in a VAT-avoidance scheme (Second Amended Complaint, ¶¶77, 79-81); Mr. Moor knew that Puridet's Tsang had control over its largest customer's bank account (Second Amended Complaint, ¶78).

Mr. Moor argues that the new allegations of the Second Amended Complaint are actually

17

"unfounded conclusions . . . based primarily on facts that were alleged in the First Amended

Complaint." [DE 175].  However, Plaintiffs have alleged that Mr. Moor had knowledge of or

recklessly disregarded specific fraud risks.  They have alleged these as facts rather than mere

labels and conclusions,[2] and we must accept them as true for the purposes of motions to dismiss.

With these additional facts, Plaintiffs have alleged facts that show that Mr. Moor's failure

to report the risks of fraud or operational improprieties were "highly unreasonable' and exhibited

an "extreme departure from the standards of ordinary care." Bryant v. Avado Brands, Inc., 187

F.3d 1271, 1282 n.18 (11th Cir. 1999).  If Mr. Moor had knowledge of or recklessly disregarded

the facts above, then it was highly unreasonable or an extreme departure from ordinary care for

him to sign the SEC filings without disclosing the risks of fraud or improprieties.  Mr. Moor

argues that simply knowing that there is an accounts receivable problem does not lead to a strong

inference of knowledge of or reckless disregard of fraud risks.  However, Plaintiffs have pleaded

that Mr. Moor knew about more than just an accounts receivable problem, they have alleged that

he was aware of the VAT-avoidance scheme, or that he recklessly disregarded that conclusion.

Mr. Moor also argues that the Second Amended Complaint's allegations give a stronger

inference that he was inquiring appropriately to certain red flags, but was deceived at every turn

by those who had been orchestrating the fraud for years before Mr. Moor worked for Dyadic.

While the Second Amended Complaint clearly alleges that the fraud had been ongoing long

before Mr. Moor became Dyadic's CFO, Plaintiffs allege that Mr. Moor became aware of or

---

[2]  One notable exception is the allegation that, because Mr. Moor received the e-mail from Mr. Smeaton regarding Puridet's acceptance of post-dated checks, it was proven that Mr. Moor knew that Mr. Smeaton was engaging in improper collections practices and that he "had no control over Smeaton or Puridet's financial reporting, internal controls, or fraud risk; and that Smeaton could control the collection of receivables from Pui Shing at a whim . . . ." (Second Amended Complaint, ¶83).  These are alleged as conclusions, and we do not feel that they are warranted.

recklessly disregarded the fraud, despite whatever deception might have occurred.

### 3. Defendant Stephen J. Warner

Mr. Warner argues that the Second Amended Complaint should be dismissed as to him because none of the statements are attributable to him and Plaintiffs have failed to allege scienter with sufficient particularity.

### 1. The Statements Mr. Warner Signed Are Attributable to Him

Mr. Warner argues that, even if the group pleading doctrine is viable, the alleged misstatements in the Second Amended Complaint cannot be attributed to him as an outside director based solely on the fact that he signed them.  Plaintiffs respond that the fact that he signed them does make the statements attributable to him, along with the allegation that Mr. Warner was responsible for authorizing financial statements.

That Mr. Warner signed five of the statements alleged[3] is enough to attribute those statements to him.  In re LDK Solar Secs. Litig., 2008 U.S. Dist. LEXIS 80717, *25-26 (N.D. Cal. Sept. 24, 2008).  The cases that Mr. Warner cites found that signing the statements does not by itself establish scienter, but did not hold that the statements could not be attributed to the signers at all.  Klein v. Goetzmann, 770 F. Supp. 78, 82 (N.D.N.Y. 1991); In re Sensormatic Elecs. Corp. Secs. Litig., 2002 U.S. Dist. LEXIS 10715 *14-15 (S.D. Fla. June 8, 2002).

### 2. Plaintiffs Have Not Alleged Scienter with Sufficient Particularity

Mr. Warner contends that Plaintiffs have failed to plead with sufficient particularity that he acted with scienter.  Mr. Warner argues that signing the statements alone does not raise an

---

[3]  The statements were amendments to registration statements, and Dyadic's 10-K forms for the years 2004 through 2006.

inference of scienter, and the allegations of what Mr. Moor reported to the Audit Committee are not specific enough to infer that Mr. Warner had scienter.   Plaintiffs respond that, because they have alleged that Mr. Moor briefed the Audit Committee "specifically regarding fraud risks and internal controls at Puridet", Mr. Moor's knowledge of various actual or potential improprieties may be imputed to Mr. Warner and the other Audit Committee members.

The Eleventh Circuit held that certification of SEC filings is "only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."  Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2004). Thus, the person signing must have had "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  Id.  Therefore, Plaintiffs must allege some specific knowledge on the part of Mr. Warner that would make him at least severely reckless in signing the statements.  While we are to "consider the complaint in its entirety", we bear in mind that "omissions and ambiguities count against inferring scienter in a securities fraud action under 15 U.S.C. §78j(b), for plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 326 (2007).

Plaintiffs do not specifically detail which facts Mr. Moor reported to the Audit Committee.  Rather, the Second Amended Complaint alleges that Mr. Moor's regularly reported to the Audit Committee "specifically regarding fraud risks and internal controls at Puridet." (Second Amended Complaint, ¶74).  The Second Amended Complaint alleges that Mr. Moor either knew or recklessly disregarded several "red flags" of fraud risks and improprieties.

20

However, Plaintiffs still have not alleged what Mr. Moor specifically reported to the Audit Committee.  As we are to count omissions and ambiguities against inferring scienter, we cannot read the Second Amended Complaint to have alleged Mr. Moor to have reported red flags that he himself could have recklessly disregarded.  Furthermore, Plaintiffs allege that the Audit Committee initiated an independent investigation into the alleged improprieties of Dyadic's Asian subsidiaries.  It is at least as strong an inference that Audit Committee initiated this investigation once it became aware of the possibility of improprieties than it is that the Audit Committee recklessly disregarded red flags reported to it by Mr. Moor, but then initiated an investigation upon the receipt of anonymous whistleblower e-mails.  We therefore find that the Plaintiffs have failed to plead scienter with regard to Mr. Warner, and thus the Motion to Dismiss must be granted as to Section 10(b).

### 4.  Defendants Harry Z. Rosengart and Richard J. Berman

Like Mr. Warner, the allegations against Mr. Rosengart and Mr. Berman arise primarily from their high-level positions with Dyadic.  As well as being members of the Audit Committee, both Mr. Rosengart and Mr. Berman were on the Board of Directors.  However, being members of the Board of Directors and the Audit Committee cannot alone create scienter.  In re Smith Gardner, Sec. Litig., 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002).  The only substantive changes made in the Second Amended Complaint is that Plaintiffs now specifically allege that Mr. Rosengart and Mr. Berman signed various statements the Plaintiffs allege are false and misleading.  As we found above with Mr. Warner, Plaintiffs have not pleaded with particularity that the members of the Audit Committee, including Mr. Rosengart and Mr. Berman, acted with scienter.  Therefore, the claims against them under Section 10(b) must fail.

## C.  Section 20(a) of the Securities Exchange Act

Section 20(a) of the Securities Exchange Act establishes liability for controlling persons, or those "who, directly or indirectly, control[] any person liable under any provision of this title or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce" the violations.  15 U.S.C. § 78t(a).  Some courts have held that Audit Committee members who sign SEC filings are controlling persons under Section 20(a).  E.g., In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 427 (S.D.N.Y. 2001); see In re Enron Corp. Secs., Derivative, & ERISA Litig., 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003) (citing cases).

The parties are in dispute as to whether Section 20(a) claims must be pleaded with the Rule 9(b) particularity requirements.  The Eleventh Circuit has not ruled on this specific issue. Defendants contend that the Eleventh Circuit's rulings on similar issues suggests that Section 20(a) claims should be pleaded with particularity.  On the other hand, Plaintiffs argue that the overwhelming trend is for courts to use the Rule 8(a) standard for pleading control liability under Section 20(a).

In Wagner v. First Horizon Pharm. Corp., the Eleventh Circuit was presented with the question of whether Rule 9(b) pleading requirements would apply to non-fraud securities claims. Wagner, 464 F.3d 1273, 1277 (11th Cir. 2006).  Wagner held that "Rule 9(b) applies when the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10b-5."  Id.  Wagner is distinguishable from this case. The issue presented in Wagner was whether non-fraudulent misrepresentations must be pleaded with particularity when the plaintiff is also seeking relief for the same misrepresentation in a

claim for fraud.  Id.  Here, the issue is whether the control aspects of a Section 20(a) claim need to be pleaded with particularity.  This Court has previously held that "[a]llegations of control are not subject to the Rule 9(b) particularity requirement, since fraud is not an element of control person liability."  Tippens v. Round Island Plantation L.L.C., 2009 U.S. Dist. LEXIS 66224, *36 (S.D. Fla. July 31, 2009).  Merely restating the legal standard does not, however, result in an adequate pleading.  Bruhl v. Price WaterhouseCoopers Int'l, 2007 U.S. Dist. LEXIS 21885, *14 (S.D. Fla. Mar. 27, 2007).

The Defendants contends that the Plaintiffs have failed to allege control person liability under Section 20(a).  In order to state a claim under Section 20(a) against the Defendants, Plaintiffs have to allege: (1) that a primary party violated Section 10(b); (2) that the Defendants had the "power to control the general business affairs of" that principal party; and (3) that the Defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability."  Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001) (quotations omitted).  "A controlling person is derivatively liable under section 20(a) for the violations of its controlled person if the controlling person acted recklessly in failing to do what he could have done to prevent the violation."  Laperriere v. Vesta Ins. Group, Inc., 526 F.3d 715, 725 (11th Cir. 2008).

This Court has already found that the Second Amended Complaint sufficiently pleaded a claim against Dyadic and Mr. Emalfarb, and we found above that it pleaded sufficiently against Mr. Gardner.  As Dyadic's CFO, Mr. Moor had the "power to control the general business affairs of" Dyadic.  Mr. Moor argues that the Plaintiffs have not identified the specific corporate policy which resulted in primary liability, and that the only possible corporate policy Plaintiffs could

allege is Mr. Smeaton's policy of using a dummy customer in the VAT-avoidance scheme. Because Mr. Smeaton attempted to keep this policy secret, Mr. Moor argues that he did not have the requisite power to directly or indirectly control the policy.  However, as Plaintiffs have argued, the relevant corporate policy involved the reporting and dissemination of financial information to the public, which the Plaintiffs adequately alleged.  (Second Amended Complaint, ¶¶127, 137).

As to all the individual Defendants, Plaintiffs allege that the individual Defendants were involved in Dyadic's day-to-day operations, signed various financial statements, and controlled the content and dissemination of the statements that Plaintiffs allege were false and misleading. Given that Plaintiffs have already sufficiently alleged Section 10(b) violations by Dyadic, these allegations meet the second and third prongs of the standard given above.  These allegations sufficiently plead that the individual Defendants had control over Dyadic's general affairs, as well the as the specific corporate policy at issue here.

### D.  Dismissal with Prejudice

Dismissal with prejudice is a severe sanction, but "its imposition is justified when a party chooses to disregard the sound and proper directions of the district court." Friedlander v. Nims, 755 F.2d 810, 813 (11th Cir. 1985).  Here, we had instructed the Plaintiffs that their (First) Amended Complaint was deficient because it did not plead scienter with particularity.  Although Plaintiffs were able to amend their Complaint sufficiently with regard to Mr. Moor, they made virtually no change with regards to pleading the scienter of the other Defendants.  Additionally, the Plaintiffs failed to remedy a fault we found with the First Amended Complaint – that Plaintiffs did not specify what exactly Mr. Moor reported to the Audit Committee.  We therefore

find that dismissal with prejudice is warranted as to Count I against Mr. Warner, Mr. Rosengart, and Mr. Berman.

### III. Conclusion

Accordingly, is **ORDERED AND ADJUDGED** as follows:

1.  Defendant Stephen J. Warner's Motion to Dismiss the Second Amended Consolidated Class Action Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) [DE 164] is hereby **GRANTED in part** as to Count I and **DENIED in part** as to Count II;

2.  Defendant Rufus Gardner's Motion to Dismiss the Amended Consolidated Class Action Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) [DE 167] is hereby **DENIED**;

3.  Defendants Wayne Moor's, Harry Rosengart's, and Richard Berman's Motion to Dismiss the Second Amended Consolidated Class Action Complaint [DE 175] is hereby **GRANTED in part** as to Count I against Defendants Harry Z. Rosengart and Richard J. Berman and **DENIED in part** as to Count II;

4.  Count I of the Second Amended Complaint is hereby **DISMISSED with prejudice** as to Defendants Stephen J. Warner, Harry Rosengart, and Richard J. Berman only;

5.  Defendants Wayne Moor, Harry Rosengart, and Richard Berman's Motion to Quash Non-Party Subpoenas and for Stay of Discovery [DE 160] is hereby **DENIED as moot**.

**DONE AND ORDERED** in Chambers, at Fort Lauderdale, Broward County, Florida this

28th day of September, 2009.


WILLIAM P. DIMITROULEAS
United States District Judge


Copies furnished to:

Counsel of record

26